CAREY, STATE TREASURER, Plaintiff, *v.* McFATRIDGE
ET AL., DEFENDANTS.

(No. 8468.)

(Submitted October 5, 1943. Decided October 22, 1943.)

[142 Pac. (2d) 329.]

*Mr. R. V. Bottomly,* Attorney General, and *Messrs. Fred Lay, Clarence Hanley* and *George S. Smith,* Assistant Attorneys General, for Plaintiff, *Mr. Smith* argued the cause orally.

*Messrs. Toomey, McFarland & Hall, Mr. E. G. Toomey,* and *Mr. H. R. Eickmeyer,* appearing in behalf of Defendants Montana Licensed Liquor Dealers Association and *Thos. F. Hurley,* president thereof, *Mr. Toomey* argued the cause orally.

*Mr. T. H. MacDonald,* State Liquor Administrator, for Defendant Montana Liquor Control Board, submitted a brief and argued the cause orally.

*Messrs. J. W. Speer* and *George R. Shepard* appeared as *amici curiae; Mr. Speer* argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

This is a declaratory judgment action, of which this court has accepted original jurisdiction as necessary and proper to the complete exercise of its appellate jurisdiction, in view of the emergency presented and the consequent inadequacy of the ordinary appellate procedure.

Plaintiff, as State Treasurer, seeks a declaratory judgment to determine his duties, obligations and status with regard to the following draft presented to him for payment:

(Obverse)

"Do Not Detach

Make no Changes on This Voucher Draft. If incorrect, Return Promptly. Indorsement Constitutes Receipt in Full for the Within Account.

The First National Bank of Chicago

By Carl Gillie /s/

Assistant Vice President

------------------------------------------------------------------------

Montana Liquor Control Board

No. C 15434

Pay to the Order of Helena, Montana, August 31, 1943
First National Bank of Chicago $150000.00

| M.L.C. B $150000 and 00Cts | Dollars |
| --- | --- |

To Montana State Treasury, Montana Liquor Control Board
 Helena, Montana: By T. H. MacDonald /s/

 Payee must endorse back Administrator
 and sign on face. By George Crispin /s/

Received Payment in Full Chief Accountant
The First National Bank of T D Window 15.
Chicago
 Carl Gillie /s/

Payee

(Reverse)

Montana Liquor Control Board

Helena, Montana, August 31, 1943 No. C 15434

Received of the Montana Liquor Control Board
First National Bank of Chicago Chicago
Special Sales Account $150000.00
Advanced by Montana Retail Liquor Dealers as Advance
Deposit of Fifteen Thousand Cases of Liquor, to be Pur-
chased from Foster and Company, New York, When Contract
 for Such Purchase Has Been Executed.
Endorsement on Back CONSTITUTES a RECEIPT in
 Full. Do not Detach.

------------------------------------------------------------------------

Special Sales Account $150000.00
Advanced by Montana Retail Liquor Dealers as Advance
Deposit on Fifteen Thousand Cases of Liquor, to be Pur-
chased from Foster and Company, New York, When Con-
tract for Such Purchase Has Been Executed.''

 By their cross-complaint the members of the Montana Liquor

Control Board and the State Liquor Administrator allege that there is a shortage of liquor supplies due to the war exigencies and that the amount of whiskey sold direct to retail purchasers is therefore rationed by the Board in the amount of one pint a week, and to licensed retailers in substantially sixty per cent. of the amounts severally purchased by them in 1942; "that on occasions some of the said retail liquor dealers have been able to locate liquor which could be purchased for them in a legal manner and which could not be purchased for the general public by the Montana Liquor Control Board"; that in May, 1943, the Board therefore established the publicly announced policy that any person entitled to buy liquor through state stores who could locate any lawfully available supply might advance the necessary funds and have the same purchased by the Board; that the Board would buy the liquor, take title, add the state mark-up and sell it to the one so locating the liquor and advancing the money, and that the same would not be considered as part of the allotment of such purchaser under the rationing system, but would be in addition thereto; that such arrangement for additional supplies not available as part of the supply taken into consideration by the Board under its rationing system was advisable to prevent rum-running, illicit distilling, black markets and other evils; that about May 30, 1943, the Board received an offer from Foster & Company, a partnership, to sell it 15,000 cases of certain blended whiskey at $19.24 per case, F. O. B. bottling plant, on terms by which the Board was required to advance $10 a case to be immediately paid to Foster & Company through the First National Bank of Chicago; that the Board concluded that it could not lawfully make the advance from Board funds, and that being unsuccessful in its attempt to obtain a modification of the requirement, and "being mindful of its duties to raise revenue for the State of Montana and to provide liquor for the purpose of sale to those who had paid their license money to the State of Montana * * *, contacted representatives of the Montana Retail Liquor Dealers Association and informed them of the above facts and asked them to contact all retail liquor dealers in the state and present

the matter so that they might make the advance deposit under the terms of the contract, \* \* \* that substantially 127 of such retail liquor dealers in varying amounts subscribed to the advance of $10.00 per case and paid said amounts to the Montana Liquor Control Board, which Board deposited said amounts with the Plaintiff as treasurer of the Montana Liquor Control Board, segregating all of said amounts in a special fund on the Books of the Board, which amount was designated 'Special Sales Account No. 9'. Said account was set up after consultation with and on the advice of the State Examiner for the State of Montana; that \* \* \* the Defendant, T. H. MacDonald, and L. H. Christensen, Purchasing Agent for these answering Defendants, proceeded to the City of Chicago and on the 13th day of September, 1943, met with representatives of the other contracting parties in the First National Bank of Chicago, examined the warehouse receipts to be deposited on the contract and approved the same and with the other contracting parties, signed the contract in question, \* \* \*.''

The Board therefore joins in the request of the plaintiff for a declaratory judgment upon the points requested by him and also upon the following questions:

''1. Is any revolving fund of $150,000 or any other amount legally established by the Board of Examiners of Montana as alleged in the complaint?

''2. May the Montana Liquor Control Board accept moneys from persons as an advance for the purchase of liquor through the state stores of the Montana Liquor Control Board, such liquor to be sold to such persons under a policy and regulation of such Board where the liquor so purchased could not otherwise be purchased by the Montana Liquor Control Board and in addition to the quotas which such persons might purchase under the general policy of the Board?

''3. May the Montana Liquor Control Board advance moneys from the funds of the Liquor Control Board under the circumstances set out in Exhibit A of the answer?

''4. May the Montana Liquor Control Board legally establish

a policy of permitting persons entitled to purchase liquor in Montana, to locate such liquors and advance money for its purchase, title to be in the Montana Liquor Control Board, and then after paying the Montana excise tax and mark-up, purchase such liquor through state stores, receiving credit for the money so advanced?

"5. May such advances be placed in a special account on the books of the Montana Liquor Control Board and deposited with its treasurer and checked out by the Board in accordance with the purposes for which it was advanced?"

The allegations of the answer are deemed admitted, no reply having been filed. It will not be necessary to refer to other pleadings and papers filed by the various defendants.

The contract (shown in the answer as "Exhibit A"), dated September 17, 1943, was between (1) Foster & Company, therein called the Sellers, (2) the Montana Liquor Control Board, called the Buyer, and (3) the American Distilling Company, called the Company. Its provisions pertinent to this action are as follows:

"1. The Sellers hereby sell and agree to deliver to the Buyer, and the Buyer hereby purchases and agrees to accept and pay for as herein provided * * * Fifteen thousand cases of 'Fifths' of a blend of straight whiskies or of such other whiskies as may be set forth in said Schedule A. The * * * Company shall make delivery of said merchandise and the Buyer shall accept delivery thereof and make payment therefor to the Sellers in accordance with the provisions hereof, that said deliveries shall be made over a period of approximately 14 months more or less beginning approximately 30 days after the date hereof and shall be in substantially equal monthly shipments.

"2. * * * The Buyer has advanced to the Sellers and deposited with The First National Bank of Chicago as depositary the sum of $150,000.00, it being understood and agreed to by the parties hereto that said advance and deposit shall be held and/or delivered to the Sellers subject to the terms and conditions of a certain agreement dated the 17th day of September, 1943, by and

between the Sellers, the Buyer, the Company, and The First National Bank of Chicago as Depositary, a copy of which said agreement is annexed hereto and designated Exhibit 1, and * * * said advance and deposit * * * shall be applied by the Sellers against and credited upon a per case basis to the purchase price of the merchandise herein agreed to be bought and sold * * *.

"3. The Sellers * * * have heretofore entered into an agreement with the Company to blend, bottle, package and deliver to the Buyer the said merchandise in accordance with the provisions herein stated * * * and the Company hereby * * * agrees with the Buyer * * * to blend, bottle, package and deliver to the Buyer the said merchandise * * * in accordance with the requisitions of the Buyer and/or subject to the provisions hereof.

"4. For the purpose of performance of the provisions contained in paragraph 3 hereof, the Sellers, subject and pursuant to the provisions of the Agreement designated Exhibit 1 hereto annexed, will furnish to the Company, by means of the warehouse receipts as therein provided, or otherwise, the whiskey and spirits so to be blended, bottled, packaged and delivered by the Company, and the Company shall furnish and pay for all containers, stamps, wrappers, labels, labor, and federal and state taxes at the prevailing rate thereof at the time of bottling accrued before or during bottling.

"5. The price per case to be paid by the Buyer to the Sellers for the merchandise hereby bought and sold shall be Fifths, $19.24 per case net, not subject to discount, or such other price or prices from time to time required by the Office of Price Administration * * * F. O. B. Pekin, Illinois or shipping point, * * * upon receipt of invoice with Bill of Lading attached."

The deposit agreement of the same date referred to in the above sales and bottling contract as "Exhibit 1," provided as follows:

"Whereas, the Buyer has contracted to purchase from the Sellers and the Sellers have contracted to sell to the Buyer Fifteen Thousand cases of a blend of straight whiskies as set forth in said agreement between the Buyer, the Sellers and the Company, herein referred to as the Sales and Bottling Contract and

"Whereas, the said whiskey is at the present time in bulk form and it is provided in said contract that the Company bottle or cause to be bottled the said whiskey and cause it to be delivered to the Buyer in cases and it is the desire of the Buyer, the Sellers and the Company to enter into an arrangement whereby the said whiskey will be made available to the Company for bottling and delivery to the Buyer in the form of case goods,

"Therefore, the Buyer, the Sellers and the Company * * * hereby agree among themselves and with the Depositary as follows:

"1. The Sellers hereby deposit with the Depositary warehouse receipts for whiskey to be used in bottling the merchandise contracted to be sold by the Sellers to the Buyer. * * *

"2. The Company, the Sellers and the Buyer herewith deposit an executed copy of the Sales and Bottling Contract entered into between them under date of September 17th, 1943.

"3. The Buyer herewith deposits, or has heretofore deposited with the Depositary the sum of $150,000.00, which sum is hereby stated to represent a payment at the rate of $10.00 per case on account of said whiskey.

"4. Promptly after the signing of this Agreement and the deposit with it of the property agreed to be deposited under paragraphs 1, 2 and 3 hereof, the Depositary is authorized and instructed to pay to the Sellers or their designee the cash deposited herewith by the Buyer. The Sellers agree to accept said amount as a partial payment on the whiskey covered under the Sales and Bottling contract * * *.

"5. From time to time on receipt of notification from the Buyer that the whiskey described in the notice is required for bottling purposes under the Sales and Bottling Contract with request by the Buyer for the release to the Company, as the Sellers' bottling agent, of the warehouse receipts covering such whiskey, the Depositary is authorized to comply with the request. * * *

"6. Warehouse receipts so requested shall be delivered by the Depositary to the Company on trust receipts for the specific

purpose of bottling the whiskey covered thereby under the terms of the Sales and Bottling Contract. It is understood that when such whiskey has been bottled, blended and packed in accordance with the provisions of the Sales and Bottling Contract, the Company, as bottling agent of the Sellers, will cause the same to be delivered to the Buyer. Immediately upon receipt of such shipment by the Buyer, the Buyer shall notify the Depositary of the fact of such delivery and upon receipt of said notice by the Depositary said Depositary shall thereupon release to the Company the trust receipt covering such whiskey. Immediately upon receipt by the Buyer of invoice with bill of lading attached, the Buyer shall pay the invoice price direct to the Sellers. * * *

"7. The Sellers will procure and at all times maintain in full force and effect at Sellers' own cost insurance in good and responsible companies covering to full insurable value all whiskey evidenced by warehouse receipts deposited with the Depositary hereunder, insuring such whiskey against all hazards customarily insured against by first-class companies engaged in the same business as the Company. * * * In the event same cannot be replaced and the proceeds from the insurance is insufficient to completely reimburse the Buyer after due allowance for merchandise theretofore delivered to the Buyer under said Sales and Bottling Contract, for the amount of the advance payment deposited with the Depositary as herein provided, the Sellers shall pay to the Buyer such sum as may be required so to reimburse Buyer.

"8. The Sellers agree that they will pay all charges including storage which may accrue under the terms of any warehouse receipts during the period that the same are on deposit with the Depositary hereunder.

"9. The whiskey covered by the warehouse receipts deposited with the Depositary as herein provided is to be held by the Depositary as security to the Buyer for the performance of the Sales and Bottling Contract by the Sellers and by the Company. It is represented to the Buyer by the Sellers and by the Company, as Sellers' Bottling Agent, and they hereby warrant that the quan-

tity of said whiskey is adequate to provide for the bottling and delivery to the Buyer of the number of cases purchased from the Sellers, and the Sellers and the Company agree to replace with whiskey of like kind and quality any deficiency in quantity which may be necessary to bottle and deliver to the Buyer the case goods as purchased, whether said deficiency be due to outage, shrinkage, evaporation or leakage, or to any other cause not covered by clause 7 of this Agreement, or by clause 7 of the Sales and Bottling Agreement hereto attached.

"10. The Sellers and the Company severally and each for itself represent and warrant to the Buyer and to the Depositary that as of the date hereof the warehouse receipts mentioned in paragraph 1 hereof and described in Exhibit A hereto attached are genuine and evidence actual whiskey or whiskies and the quantities, inspections and proof thereof as set forth and described in said warehouse receipts.

"11. In the event of the breach or default by the Sellers and/or by the Company in the performance of their obligations under this agreement, or under the Sales and Bottling Agreement hereto attached, the Depositary, upon being shown to its satisfaction that such breach or default has occurred and upon being requested so to do by the Buyer, shall deliver to the Buyer all warehouse receipts remaining in the possession of the Depositary which were deposited with said Depositary pursuant to paragraph 1 of this Agreement, but the fact of such delivery shall not relieve the Sellers or the Company from liability to the Buyer for such legal damages as may be sustained by said Buyer."

We find nothing unlawful in this purchase. It was made by the Board under its statutory power "to buy, import, and have in its possession for sale, and sell, liquors, in the manner set forth in this act" (subd. (a) of Sec. 2815.67). There is nothing in the Act qualifying or limiting the Board's right or method of purchase, with reference either to the down payment or to any other provision of the contracts in question. The Board clearly had the right to make the down payment out of its own

funds under such arrangement as this, under which its interest thus obtained in the liquor was fully protected.

It is apparent that by the contract the Board purchased the liquor, the three-party contract being necessary because the liquor, which was in bulk, was to be delivered bottled and cased, which the sellers were not personally in a position to do; and the four-party depositary contract being necessary because, to protect the Board in its purchase in view of the advance payment, the liquor was to be held by the bank as depositary through the medium of warehouse receipts, and of trust receipts pending the bottling and delivery.

It is also apparent that while the contracts provided that the $150,000 was delivered to the bank as depositary they also provided that immediately upon the execution of the contracts the money was to be paid to the sellers by the bank. Therefore upon the signing of the contracts and the payment of the money, the bank is to be a depositary, not of the Board's money for the sellers' protection, but only of the merchandise for the Board's protection. Furthermore, the reference to the deposit of money is explained by the allegation of the answer that the contracts were actually executed on September 13th but were dated September 17th so as to permit the draft in question to be forwarded to Helena for payment, indicating that by the deposit was meant the delivery of the draft. It follows therefore that if and when the draft is paid with money now held by the plaintiff, the money will not be deposited with the bank as public funds, but will be paid to the bank for immediate delivery to the sellers under the terms of the contract.

It was apparently this feature of the arrangement which was misunderstood and misconstrued as possibly constituting an improper deposit of state funds in an unbonded and unauthorized depositary. Since the draft was issued as a down payment under a valid contract of the Board for the purchase of liquor, and not as a public deposit of funds in an unauthorized bank, it can properly and safely be honored by plaintiff regardless of the source of the Board's funds. In this respect it makes no differ-

ence whether it represented money received as full cash payment for liquors theretofore sold and delivered, or as partial down payments for liquors agreed to be purchased for future delivery by the 127 dealers in question. If the objection were valid in the one case, it would be equally valid in the other, for when paid to the Board as an advance payment of $10 per case it became the Board's money, like money paid to any merchant under a partial payment contract. But the objection is not valid in either case, since the funds are paid out to the sellers through the bank for goods purchased under a valid contract, and are not deposited to be held by the bank as a depositary of public funds. Nor does the Board's contract constitute a pledging of the state's credit under section 2815.154, which as amended by Chapter 54, Laws of 1939, infra, provides that no obligation of the Board shall ever become a debt or claim against the state.

We do not find anything contrary to law in the partial payment by the dealers to the Board. While under subdivision (2) (c) of section 2815.71, Revised Codes, the purchase price must be paid in cash before the goods are delivered to the purchaser, that provision is not violated by a partial payment prior to, and a final payment upon, the delivery.

The contract with the dealers is not invalidated by the rationing system set up by the Board. That system having been found necessary in the emergency war situation, and being reasonably within the Board's statutory power under subdivision (j) of section 2815.68 to prescribe "the kinds and quantities of liquor which may be purchased under permits of any class," the Board had full power to establish the rationing system and full power to amend or alter it either directly or by lawful transactions having that effect, without discrimination as among the holders of any class of permits.

If the liquor in question would not otherwise have been available to the people of the state, and if it was therefore not taken into consideration in the rationing system, no injustice seems to be done other prospective purchasers by the agreement with the dealers whose advance payment has caused the liquor

to be purchased by the board, especially since all similarly situated were given the opportunity to participate. This is true even though in further similar purchases the Board may properly use any available funds as a down payment without violating the provision against the deposit of public funds in unauthorized depositaries.

It is suggested that certain references indicate that the liquor was being purchased by the dealers, or by the Board as mere agent for the dealers. But the written contracts above recited constitute a purchase of the liquor by the Board, and the contract with the dealers shown by the circumstances can constitute nothing but an agreement for the sale and delivery of the liquor to them upon its receipt, and a partial payment by them in advance.

But what appears to be a real defect in the contract with the ▇▇▇ dealers is the fact that the Board's consent was not free, sec. 7475, Rev. Codes, but was the clear result of a mistake of law, sec. 7484, Rev. Codes, apparently indulged in by both parties, or at least by the Board and not corrected by the dealers, sec. 7486, Rev. Codes; and that the contract may therefore be subject to rescission as provided by statute, sec. 7474, Rev. Codes. This question, between the defendants who constitute the Board, and the defendants, Montana Licensed Liquor Dealers Association, and Thomas F. Hurley, its president, who are allegedly authorized to represent the interested dealers for the purposes of this action, has not here been litigated and cannot here be decided. But it may be the duty of the Board to have the question adjudicated in a proper action in the general public interest.

It is worthy of note that upon the enactment of the State ▇▇▇ Liquor Control Act as Chapter 105, Laws of 1933 (now sections 2815.60 to 2815.163, inclusive, Rev. Codes of 1935), the legislature provided that all money received from the sale of liquor and from license fees, taxes and otherwise, should be paid to the Board and that the Board should make such expenditures from the fund as were necessary in the administration of the Act, secs. 2815.153 and 2815.154; and that the latter section was

amended by Chapter 54, Laws of 1939, to provide further that: "no obligation created or incurred by the board shall ever be, or become, a debt or claim against the State of Montana, but shall be payable by the board solely from funds derived from the operation of state liquor stores, and the board shall pay into the state treasury the receipts from all taxes and licenses by it collected, and also the *net proceeds* from the operation of state liquor stores."

It is apparent that the legislature so provided in realization of the fact that the state was thus embarked in a business enterprise, the conduct and the handling of the funds of which should be on a basis appropriate to a business rather than upon the basis devised by the people and their representatives for the handling of their political affairs and funds, and that only the tax and license fees and the *net proceeds* from the liquor sales were to become part of the political funds of the state as distinguished from its business funds under the control of the Board. The provision is further confirmed by the reference in other legislative enactments, such as section 1 of Chapter 14, Laws of 1941, to the disposition by the State Treasurer of "all *net* revenues and receipts received by him from and under the operation of the State Liquor Control Act." Thus, although he is designated as ex-officio the treasurer of the Liquor Control Board by section 192, Revised Codes, it seems clear that until determined to be "net revenues and receipts" the liquor sales moneys are held by him as the Board's treasurer under the Liquor Control Act rather than as treasurer of the state's political funds under the provisions relating to the political funds and expenditures of the State as such.

The Board therefore having full control of the business funds ▮▮ ▮▮ in question under legislative mandate, the establishment of a revolving fund for the Liquor Control Board by the Board of Examiners is neither applicable nor necessary, thus disposing of the defendants' first question.

In view of what has been said, the remaining questions submitted by the defendants must be answered in the affirmative,

with the proviso that the practice followed should be impartial and nondiscriminatory as among the holders of permits of any class. We find also that it is the plaintiff's duty to honor the draft in question, and others lawfully issued by the Board under the Liquor Control Act, and as ex-officio treasurer of the Board to accept its lawful deposits, whether they represent full or partial cash payments for liquor purchased or agreed to be purchased from the Board.

Let judgment be entered in accordance herewith.

ASSOCATE JUSTICES ANDERSON and MORRIS concur.

MR. JUSTICE ADAIR, dissenting:

This case involves the authority of the Montana Liquor Control Board, in the absence of statute, to sell direct to certain licensed retail liquor dealers in the state 15,000 cases of Old Rocking Chair Whiskey, now in bulk and unbottled, which is not kept in stock in any state liquor store nor is the price thereof posted in any state liquor store nor is said whiskey within the state of Montana.

The state treasurer holds an office created by the Constitution. By section 4 of Article VII thereof, he is prohibited from holding, during his term, any other office except member of the state board of education and he is prohibited from receiving any fee for his own use for the performance of any official duty.

The Montana State Liquor Control Board, on the other hand, is purely a creature of statute. It is a bureau. It has only such powers and duties as are conferred upon it by its creator, the state, acting by and through its legislative department. As was correctly said by this court in *McFatridge* v. *District Court,* 113 Mont. 81, 88, 122 Pac. (2d) 834, 838: *"The board is an administrative body, functioning as a bureau of the executive department of the state government.* It has no law-making power. Any attempt to create for itself authority and discretion not given by the legislature must fail.'' (Emphasis mine.)

This is a government of laws and not of men. Under such a system the Board at all times is an agency of the state and sub-

ject to the control of the state. The only authority and the only discretion that it has is such as is given it by the state legislature. It functions under the governor "as a bureau of the executive department of the state government". (*McFatridge* v. *District Court,* supra.) It was created to assist the governor in performing his constitutional duty to "see that the laws are faithfully executed," (Art. VII, sec. 5, Constitution), and particularly such laws as pertain to the liquor traffic in the state, it being provided in the Constitution that, "The supreme executive power of the state shall be vested in the governor, who shall see that the laws are faithfully executed." (Art. VII, sec. 5, Constitution of Montana.)

It was neither the purpose nor intent of the legislature to constitute the Board an uncontrolled bureau to embark on a private business enterprise in "the conduct and the handling of the funds" which came into its possession. The legislature did not contemplate that the operations of the Board "should be on a basis appropriate to a business rather than upon the basis devised by the people and their representatives for the handling of their political affairs and funds."

In its answer the Montana Liquor Control Board pleads that about May 30, 1943, it received an offer from Foster & Company, a partnership, to sell to the Board 15,000 cases of Old Rocking Chair Blended Whiskey at the price of $19.24 per case f. o. b. bottling plant; that by the terms of said offer the Board was to be required to advance to Foster & Company, through the depositary the First National Bank of Chicago, the amount of $10 per case for such liquor, which amount was to be immediately payable to Foster & Company and "That the Montana Liquor Control Board, after seeking for a matter of weeks, a modification of the terms of such advance payment without success, concluded that the Board could not legally make the advance from liquor funds and, *being mindful of its duty to raise revenue* for the state of Montana *and to provide liquor for the purpose of sale to those who had paid their license money* to the state of Montana, under the implied agreement of the state to furnish

them liquor for sale, contacted representatives of the Montana Retail Liquor Dealers Association and informed them of the above facts and asked them to contact retail liquor dealers in the state and present the matter so they might make the advance deposit under the terms of the contract which these answering defendants believed that the Montana Liquor Control Board could not make." (Emphasis mine.) Thus did the Board consider that it was "its duty to raise revenue for the state" and ''to provide liquor for the purpose of sale to those who had paid their license money to the state" rather than "the protection, health, welfare and safety of the people of the state" as the legislature had announced to be the purpose of the legislation. (See Chapter 84, sec. 1, Laws of 1937.)

The Montana Liquor Control Board was created by the enactment of Chapter 105, Session Laws of 1933, which, as amended, appears as sections 2815.60 to 2815.163, Revised Codes of 1935. The bill, which upon its enactment became Chapter 105, originated in the senate and was entitled "An Act to Limit, Regulate and License the Manufacture and Sale of Any and All Liquors or Beverages That May Hereafter be Manufactured, Sold or Dispensed in the State of Montana." Originally the State Board of Examiners, (the Governor, the Secretary of State and the Attorney General) constituted the "Montana Liquor Control Board." This was changed by the enactment of Chapter 30, Laws of 1937, providing for the appointment of the members of the Board by the Governor with the consent of the Senate. The statute was not enacted for the purpose of raising revenue but it was and is a police regulation adopted by the legislature in the exercise of the police power of the state. (See *State* v. *Driscoll*, 101 Mont. 348, 54 Pac. (2d) 571, 578.) Had the Act been for raising revenue, it would have been necessary that it originate in the house of representatives and not in the senate in order to comply with section 32 of Article V of the Constitution which provides: "All bills for raising revenue shall originate in the house of representatives; but the senate may propose amendments, as in the case of other bills." In the *Driscoll case*, supra,

this court upheld the constitutionality of the Act and declared, "The purpose of the Act was to limit and regulate the manufacture and sale of intoxicating liquor, as disclosed by the title and as disclosed by the provisions of the Act itself; the means of effectuating the limitation and regulation is by the system provided in the Act. True, the Act contains provisions as to the disposition of surplus profits from the conduct of the business, if any. As was said by the supreme court of Oregon in the case cited, supra, [*Northern Counties Investment Trust* v. *Sears,* 30 Or. 388, 41 Pac. 931, 936, 35 L. R. A. 188] persons are not required to contribute under the provisions of the Act unless they desire to purchase liquor, and, if they do, they receive something for the expenditure of their money other than good government. Such profit as may be obtained from the conduct of the state liquor stores is incidental to the main purpose of the Act to limit and regulate the manufacture and sale of intoxicating liquors."

As further evidence of the intent of the lawmakers to control, by statute, the liquor traffic within the state, attention is directed to section 1 of Chapter 105, Laws of 1933, which reads, "This Act may be cited as the 'State Liquor Control Act of Montana.'"

From the earliest times, it has been found expedient for the state to control the liquor traffic. As is well said in 30 American Jurisprudence:

"The form of control is a matter for the state to decide as a question of public expediency and morality. The exercise of regulation and control of the liquor traffic has become so general that it has been said that courts may judicially notice that most free governments have made the business of selling liquor subject to regulation." (Sec. 16, p. 261.)

"Although intoxicating liquors and traffic therein, where permitted or tolerated, are as lawful as any other property or business and as fully entitled to protection, yet the liquor traffic is admittedly dangerous to public health, safety and morals. * * * Primarily, intoxicating liquors and the liquor traffic are subject to the police power of the several states, to which the power,

together with the mode of its exercise and full police authority to make it effective, is reserved." (Sec. 22, p. 264.)

"Since the matter of liquor control is referable to the police power, a power that has resided principally in the states since the beginning of the present system of government, and was not surrendered to the Federal Government,—the entire subject is within the power of the states, except in so far as their authority is limited by that vested in the Federal Government. The power of a state with respect to intoxicating liquors is said to exist as a correlative of its duty to support paupers, to protect the community from crime, and to confine and maintain the criminal, since the liquor traffic is a source of pauperism and crime." (Sec. 28, p. 270.)

"Subject to such restrictions as the state Constitution may prescribe, it is a matter exclusively within the discretion of the state legislature to decide the form of liquor control, * * * and having decided, it may adopt such measures as are reasonably appropriate or needful to render such control effective. * * * The scope and extent of such regulations depend solely upon the judgment of the lawmakers, with the wisdom of which the judiciary has no concern, provided, always, that they do not transcend the limits of state authority by invading rights which are secured by the Constitution of the United States, and provided further that the regulations adopted do not operate a discrimination against the rights of residents or citizens of other states." (Sec. 29, p. 271.)

The United States Supreme Court, in *Mugler* v. *State of Kansas*, 123 U. S. 623, 8 S. Ct. 273, 295, 31 L. Ed. 205, said:

" 'It is not necessary, for the sake of justifying the state legislation now under consideration, to array the appalling statistics of misery, pauperism, and crime which have their origin in the use or abuse of ardent spirits. The police power, which is exclusively in the states, is alone competent to the correction of these great evils, and all measures of restraint or prohibition necessary to effect the purpose are within the scope of that authority.'
* * *

"But by whom, or by what authority, is it to be determined whether the manufacture of particular articles of drink, either for general use or for the personal use of the maker, will injuriously affect the public? Power to determine such questions, so as to bind all, must exist somewhere; else society will be at the mercy of the few, who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the state, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety. * * * The courts cannot, without usurping legislative functions, override the will of the people as thus expressed by their chosen representatives. They have nothing to do with the mere policy of legislation. Indeed, it is a fundamental principle in our institutions, indispensable to the preservation of public liberty, that one of the separate departments of government shall not usurp powers committed by the constitution to another department. * * * Those rights are best secured in our government, by the observance, upon the part of all, of such regulations as are established by competent authority to promote the common good. No one may rightfully do that which the lawmaking power, upon reasonable grounds, declares to be prejudicial to the general welfare.''

That the state legislature in enacting the present legislation respecting the liquor traffic did so in the exercise of the police power of the state and not for the primary purpose of raising revenue is clearly demonstrated by the legislative declaration of public policy set forth in the first section of Chapter 84, Session Laws of 1937, which provides: ''It is hereby declared as the policy of the state that it *is necessary to further regulate and control* the sale and distribution within the state of alcoholic beverages, and to eliminate certain illegal traffic in liquor now existing, and *to insure the entire control* of the sale of liquor in the Mon-

tana liquor control board, it is advisable and necessary, *in addition to the operation of the state liquor stores now provided by law*, that the said board be empowered and authorized to grant licenses to persons qualified under this act, *to sell liquor purchased by them at state liquor stores at retail posted price in accordance with this act* and under rules and regulations promulgated by the said board, and under its strict supervision and control, and to provide severe penalty for the sale of liquor *except by and in state liquor stores and by persons licensed under this act.* The restrictions, regulations and provisions contained in this act *are enacted by the legislature for the protection, health, welfare and safety of the people of the state."* (Emphasis mine.)

Again, section 14 of Chapter 84, supra, provides: "The board is hereby authorized to sell *through its stores* all kinds of liquor, wine, and cordials *kept in stock* to licensees licensed under this act *at the posted price thereof in the store in which said liquor is sold. All sales shall be upon a cash basis.* The posted price as used herein shall mean the retail price of such liquor as fixed and determined by the Montana liquor control board and in addition thereto an excise tax as in this act provided." (Emphasis mine.)

In *State* v. *Andre,* 101 Mont. 366, 371, 54 Pac. (2d) 566, 568, this court said: "The right of the state in the exercise of its police power to either prohibit entirely the sale of intoxicating liquors or regulate the sale thereof is thoroughly established. The manner and extent of the regulation, if there be regulation, rests in the legislative judgment of the state and is a matter of legislative policy. (*Crowley* v. *Christensen,* 137 U. S. 86, 11 S. Ct. 13, 34 L. Ed. 620; *Ajax* v. *Gregory,* 177 Wash. 465, 32 Pac. (2d) 560.) It is *generally held* that where the state prohibits the sale of intoxicating liquors by private individuals or corporations, and itself engages in the distribution thereof, *the regulation of the sale thereof is admittedly within the police power.* (15 R. C. L. 267; note in 14 A. L. R. 1152; *State* v. *Aiken,* 42 S. C. 222, 20 S. E. 221, 26 L. R. A. 345; *Ajax* v. *Gregory,* supra.)" (Emphasis mine.)

In *State ex rel. Wilkinson* v. *Murphy*, 237 Ala. 332, 186 So. 487, 495, 121 A. L. R. 283, the court said:

"The exercise of the police power is a governmental function. It is a power that cannot be alienated or surrendered by the legislature. (*Alabama Water Co.* v. *City of Attalla*, 211 Ala. 301, 100 So. 490. See, also, *Phoenix Assur. Co.* v. *Fire Department of City of Montgomery*, 117 Ala. 631, 23 So. 843, 42 L. R. A. 468.) It follows as of course that it is a power that is to be exercised for public purposes only. * * * The police power has been described as the law of necessity. It is the power of self-protection on the part of the community. (11 Am. Jur. 978.) It has been said in reference to legislation concerning intoxicating liquors, that the power of the state in this regard is an incident to society's right of self-protection. 'It is therefore essentially subject to the police power and has been so regarded for over a century.' (15 R. C. L. 254.) *Its regulation and control is held by all the authorities to be a governmental function based upon the duty of the government to protect the community from crime and the burdens of pauperism.* So regarded, when the state itself takes over the traffic, it is as much in the exercise of a governmental function, through the police power, as when it works its convicts on farms purchased and in factories constructed by the state.

"As we read the argument, it is conceded that as to regulation, control or prohibition of the liquor traffic, the state is in the exercise of its police power and of its governmental functions, but that when the state establishes its own liquor stores, there is a sudden shift from the police power, and the government is then engaged in a private enterprise. And this is urged, notwithstanding the universally recognized principle that it is the peculiar function of the lawmakers to ascertain and to determine the appropriate measures to be used in the exercise of this undoubted police power. No one has any inherent right to engage in the liquor traffic, and this argument leads to the illogical result that the state may license and delegate to another that which it cannot do itself. Sound reasoning, we submit, justifies

no such conclusion. * * * Time moves on, and government takes account of the measured step of progress for the application of the police powers to meet new public needs. * * * It is clear enough, therefore, that what was said by the Court in *Helvering* and *South Carolina Cases,* supra, as to a private enterprise can have no bearing here. Those cases as well as *Brush* v. *Commissioner,* 300 U. S. 352, 57 S. Ct. 495, 81 L. Ed. 691, 108 A. L. R. 1428; *Helvering* v. *Gerhardt,* 304 U. S. 405, 58 S. Ct. 969, 82 L. Ed. 1427, and *Allen* v. *Board of Regents of University,* 304 U. S. 439, 58 S. Ct. 980, 82 L. Ed. 1448, demonstrate that *the state had the right in the exercise of the police power to take over the liquor traffic, and that in so doing it was exercising a governmental function.* All of which is entirely consistent with the theory that the courts will not extend the tax exemptions in such instance.'' (Emphasis mine.)

In the above case the supreme court of Alabama quoted with approval from the Montana case of *State* v. *Andre,* supra.

When this court recognizes, as it did in the *Andre case,* supra, that the regulation of the sale of liquor is admittedly within the police power of the state and when we further recognize that the exercise of the police power of the state is always a governmental function and never a private business enterprise, then do we appreciate the fact that the state of Montana has but taken over the liquor traffic in this state in the exercise of a governmental function of the state and that the moneys collected and the funds derived in the course of such business are all state moneys and state funds which, under the law, must be deposited with the state treasurer. As to the treasurer's duties in that behalf, see sections 174, 182, 192, 195, Revised Codes, and Chapter 14, section 1, Laws of 1941.

During the time that the Montana Liquor Control Board was composed of the Governor, the Secretary of State and the Attorney General, the Board of Examiners, by resolution duly adopted and entered upon its minutes, set up a revolving fund in the amount of $150,000 for the Montana Liquor Control Board pursuant to the provisions of section 195, Revised Codes of 1935,

which statute provides: "The state board of examiners may in its discretion, by resolution duly adopted and entered upon the minutes of said board, authorize the establishment and maintenance at any and all of the state institutions, or in any of the departments, boards, or commissions, of Montana of contingent revolving accounts, transferring in trust to the business offices of said institutions such sums of money as may appear necessary, to be used by said institutions for the payment of demands requiring immediate cash payment, under specific regulations to be established by said board of examiners. But each and every state institution granted a contingent revolving account shall report to the state board of examiners monthly all transactions involving such contingent revolving accounts, with proper vouchers for every payment made therefrom. The state board of examiners may cancel such authorizations and recall such funds at pleasure."

It is conceded that on September 17, 1943, there was in the office of the state treasurer, in the fund of the Montana Liquor Control Board, the vast sum of $1,276,513.80 plus $47,271.20 of unallocated receipts; that orders and drafts drawn by the Board had been presented for payment in the sum of $326,511.05 exclusive of the draft of $150,000 payable to the First National Bank of Chicago and that none of the claims represented by said orders and drafts had then been presented to the State Board of Examiners for approval, the total of which orders and drafts being greatly in excess of the said revolving fund of $150,000.

As I read the law, the Montana Liquor Control Board comes within the specific provisions of section 195, Revised Codes, supra, and I cannot agree that the Board has "full control of the business funds in question under the legislative mandate" and that therefore "the establishment of a revolving fund for the Liquor Control Board by the Board of Examiners is neither applicable nor necessary" as is stated in the majority opinion herein. Liquor Control Board or no Liquor Control Board, the Constitution of this state and the valid enactments of the legislature of this state, respecting the appropriations of public money

and respecting the deposit, expenditure and handling of public funds, apply.

The State Liquor Control Board is not above the law but, as stated before, it is simply a creature of the law. By the same Constitution and by the same law that controls others is the State Liquor Control Board itself controlled. In the creation of the Board, the legislature but created a supervising agency to assist in the control of the liquor traffic and it did not create an uncontrolled bureau which, like a Frankenstein monster, shall be permitted to walk rough shod over the Constitution and statutes of this state and thereby effect the ultimate destruction of its creator. Under our system of government, no board or bureau created by the law can be lawfully exempted from the wise and salutary provisions of the Constitution. Neither should they be considered beyond the reach of the general statutes and of the public policy which are for the protection of the commonwealth. While Chapter 54, Session Laws of 1939, provides that the Board is authorized to make such expenditures as from time to time become necessary in the administration of the Act, yet when it comes to paying for merchandise the expenditures are limited to *"proper expenditures* incurred in acquiring property and merchandise in connection with the administration of this act'' and the Board is required to ''pay into the state treasury the receipts from all taxes and licenses by it collected, and also the net proceeds from the operation of state liquor stores.'' Notwithstanding the enactment of Chapter 54, Session Laws of 1939, the 1943 legislature saw fit to include in House Bill 151, being a general appropriation bill, an appropriation for the State Liquor Control Board from the liquor board fund of ''So much thereof as may be necessary to carry out the provisions of Sections 2815.153 and 2815.154, Revised Codes of Montana, 1935'' for the fiscal year beginning July 1, 1943, and ending June 30, 1944, and a like appropriation for the fiscal year beginning July 1, 1944, and ending June 30, 1945. (See Session Laws of 1943 at pages 531 and 543.) Thus it is clear that the legislature deems the constitutional and statutory provisions respecting appropriations

applicable to the expenditure of moneys by the Board and that the legislature considered it necessary for it to pass an appropriation measure to make available funds to meet the Board's expenditures. I cannot therefore agree with the conclusion of the majority opinion to the effect "that only the tax and license fees and the net proceeds from the liquor sales were to become part of the political funds of the state as distinguished from its business funds under the control of the Board."

The majority opinion cites section 192, Revised Codes of Montana of 1935, and section 1 of Chapter 14, Laws of 1941, in support of their conclusion that until determined to be "net revenue and receipts," the liquor sales moneys are held by the state treasurer, Thomas E. Carey, "as the Board's treasurer under the Liquor Control Act rather than as treasurer of the state's political funds under the provisions relating to the political funds and expenditures of the state as such." I find no authority for such a conclusion in either section 192, Revised Codes of Montana, or in Chapter 14 of the Session Laws of 1941. Section 192, Revised Codes, expressly states: "that the provisions of this Act shall not apply to the operation of the funds of the workmen's compensation act, * * * *nor to state regulatory boards,* nor to the provisions of section 195, relating to revolving funds."

Chapter 14, Session Laws of 1941, in part provides:

"Section 1. The state treasurer shall deposit to the credit of the state general fund all moneys received by him on and after July 1, 1941, from the collection of * * * liquor license taxes under Chapter 84 Session Laws 1937, as amended, * * * and the state treasurer shall also deposit to the credit of the state general fund all moneys received by him on and after July 1, 1941, from the collection of license taxes, fees and from all other sources under the operation of the Montana beer act, and being Sections 2815.10 to 2815.59, inclusive, as amended, and all net revenues and receipts received by him from and under the operation of the state liquor control act, being Sections 2815.60 to 2815.163, inclusive, as amended. * * *

"Section 9. * * * All fees, charges, taxes and penalties pro-

vided by this act collected by or under authority of the board, together with all revenues received from other sources under this act, shall be paid over to the state treasurer, and constitute a special fund to be designated 'Montana beer act' fund, which, to the amount of ten per centum (10%) of the net amount of current revenues received and paid into the state treasury, shall be available for payment of the expenses of the board in the administration of this act, and the state examiner shall quarterly audit the books of the board in order to determine that the amount of money received as shown by the books of the board correspond with the books of the state treasurer. Whenever the amount of money in the 'Montana beer act' fund shall exceed ten thousand dollars ($10,000), all in excess of five thousand dollars ($5,000) shall be by the state treasurer transferred to the state general fund.''

In the state of Montana there are approximately 900 licensed retail liquor dealers. These dealers have associated themselves together in a corporation known as ''Montana Licensed Liquor Dealers Association.'' Under date of May 25, 1943, the state liquor administrator signed and addressed to the said corporation and its president and secretary the following communication written on the letterhead stationery of the Board:

''Gentlemen:

''In conformity with a policy of the Montana Liquor Control Board to permit purchases through the Montana Liquor Control Board by any retail liquor dealer, duly licensed by the Montana Liquor Control Board, of any supply of liquor which the Board, through its efforts, may not be able to have located or purchased, you are specifically authorized, as follows:

''1. You may acquire and cause to be imported into the state of Montana, wines, liquors and other potable alcoholic beverages within the control of the Montana Liquor Control Board, under the following conditions and until this concession is rescinded.

'' (a) The original purchase price of all such purchases shall be financed by you.

'' (b) All such purchases into Montana shall be shipped to the

Montana Liquor Control Board at Helena, Montana, with the additional shipping designation 'R. L. D.' and title to all such purchases shall be in the Montana Liquor Control Board until redelivery of such title to such retail liquor dealers through the vendors of the state stores in Montana.

"(c) Shipments so made and identified will be distributed by the Montana Liquor Control Board to holders of Montana retail liquor licenses only and upon the direction of an authorized representative of the Montana Licensed Liquor Dealers Association.

"(d) Such shipments of liquor shall be subject to the established markup of the Montana Liquor Control Board and such markup shall be computed as on other purchases by the Montana Liquor Control Board at the distillers' or sellers' price to Montana, or other Monopoly states, plus the freight, and where no such quotation of prices is available the Montana Liquor Control Board shall determine what is the distillers' price.

"(e) Such acquisitions and purchases of liquors shall not be made from any seller or distiller whose products are now purchased by the Montana Liquor Control Board, at the date of this authorization; although such products, which shall not have been acquired directly or indirectly from any such seller or distiller, are exempted from this provision.

"(f) All purchases made hereunder shall conform to all federal requirements and regulations, standards and consent of the liquor authority of the state from which they are shipped.

"(g) The freight from the central warehouse in Helena to State Liquor Store is taken care of in the regular markup and will be at no extra expense to the R. L. D.

"By way of explanation, this privilege is granted only by reason of the scarcity of liquor due to war conditions and will be granted only to duly Montana licensed retail liquor dealers and not to any agents or brokers, and warning is hereby given that purchases through any such brokers or purported agents in Montana are strictly forbidden."

One hundred twenty-seven of the retail dealers contributed a

total of $151,347.50 which was paid to the Board and thereupon the Board sent the following communication to each of the retail dealers who had contributed to the fund, inserting the respective amounts contributed by the dealer to whom the letter was addressed, viz.:

"Montana Liquor Control Board
Helena, Montana
September 8, 1943

Please Wire The Montana Liquor Control Board Today If The Following Is Not Correct.

T. H. MacDonald, Administrator

"Dear Sir:

We receipt for $........................ sent us as a receiving agent for dealers under the following conditions.

This money is to be transmitted by us for you to the First National Bank of Chicago for deposit on a contract entered into by us for you with The American Distilling Company and one of their subsidiary corporations for the deposit of this money on the purchase by us of a quantity of Old Rocking Chair whiskey, this whiskey to be purchased by the Montana Liquor Control Board and delivered to you.

We assume no responsibility for this $........................ beyond that of sending it to the First National Bank of Chicago for deposit and assume no responsibility to deliver you any liquor until we receive it.

Montana Liquor Control Board
By T. H. MacDonald (signed)
Administrator

(NOTE)

We will order the above-described liquor and contract for it, and title thereto will be in us until we sell the liquor to you at your state liquor store. You will pay the balance of the purchase price of this liquor when we are required to pay the balance of the purchase price and the amount you will be required to pay

will include the freight from the shipper to Helena, the state markup and all new federal taxes levied above the distillery price, which is $19.24 per case of 12 fifths. The state markup is 58% of $19.24, the distillery price. The tentative total price to you will be $30.00 per case.

This liquor will not affect your regular quota of liquor which you are entitled to purchase from the Board but will be in addition thereto. You must be prepared to take this liquor on its arrival and to pay for it. If you do not take it, we will reserve the right to forfeit your payment of $10.00 per case and divide your share of this liquor between all retail liquor dealers in the state and the public. Whether or not we do forfeit the $10.00 per case shall rest in the sound judgment of the Board and will depend on conditions of the liquor business at the time the liquor is shipped to us.

We understand that this liquor is to come over a period of fifteen months. This proviso as to the forfeiture of the $10.00 per case is expressly made a "condition precedent" to our ordering this liquor for you.

You Will Notify Us By Saturday, September 11, 1943, If The Conditions Of This Receipt Are Not Agreeable Or At That Time We Will Forward Your Money To The First National Bank Of Chicago.

Yours very truly,
Montana Liquor Control Board
By T. H. MacDonald (signed)
Administrator.''

The $151,347.50 received by the Board pursuant to the above arrangement was deposited with the state treasurer without any information to him that same constituted anything other than a usual and customary deposit of the Board. Later, when the draft hereinbefore set out in the majority opinion was presented, the state treasurer declined to pay same without a determination as to (1) whether the money rightfully belonged to the state treasury as the money of the Board or (2) whether it was money belonging to the Montana Liquor Dealers Association or (3)

whether it was money belonging to the individual retail dealers in the respective amounts contributed by each.

The legislature of this state has determined and set forth in plain language what measures it deems appropriate and needful for "the protection, health, welfare and safety of the people of the state", (Chapter 84, sec. 1, Laws of 1937), so far as the liquor traffic is concerned. It has provided (1) for the establishment and operation of state-owned liquor stores; (2) for the appointment of a vendor to conduct the sale of liquor at each store, (sec. 2815.70, Rev. Codes); (3) for the display in each state store of a retail posted price of all stock; (4) for the selling upon a cash basis, and (5) for the selling through said state stores of "all kinds of liquor, wine and cordials kept in stock to licensees licensed under this act at the posted price thereof in the store in which said liquor is sold." (Chapter 84, sec. 14, Laws of 1937.)

The Board is required to take the law as it is written. The fact that, under the law, the Board is entrusted with the administration of the state liquor laws and with the general supervisory control of the state liquor set-up, including the numerous state stores, does not supply the Board with power of authority to deviate from the method prescribed by the legislature for selling liquor in this state. Neither the Board nor the administrator is authorized to make any sales of liquor direct to licensees whether they be licensed retail liquor dealers or licensed individual consumers. Liquor may not be lawfully sold by the Board at the state warehouse, at the Board's offices or at any place other than by a regularly appointed vendor in a state liquor store, and then it must be sold from merchandise "kept in stock" "at the posted price thereof in the store in which the liquor is sold" and for cash.

The legislature has seen fit to require the various licensees to make their purchases of liquor from the vendors at the liquor stores and, as yet it has not clothed the Board with any authority to make sales on a down-payment or installment plan of liquor which is not kept in stock, which never will be kept in stock,

which as yet is not even bottled, and which appears on no posted price list in any state store.

As was said by Mr. Justice Anderson speaking for this court in the *McFatridge case*, supra, "Any attempt [by the Board] to create for itself authority and discretion not given by the legislature must fail." It matters not whether there is a shortage of liquor due to the war exigencies, whether whiskey is rationed, whether the retail dealers have been able to locate liquor which the Board could not locate or purchase without the aid and influence of the dealers, or whether the state will sustain a loss in revenue,—the fact still remains that in the legislative department of this state alone is lodged the power to regulate and control the liquor traffic and the legislature has exercised that power by requiring all state liquor to be sold by vendors through state stores and it does not permit lawful sales to be made in any other than the prescribed manner. Any change in the statutory set-up must be effected through the legislative department. No change in the statute may be lawfully effected by either the executive department nor by the judicial department, for in Article IV of the Constitution it is provided that "no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted."

In the communication dated September 8, 1943, the administrator acknowledges receipt of the money as a "receiving agent" for the contributing dealers, stating that the money would be transmitted by the Board for the dealer making the advance to the First National Bank of Chicago, for deposit on a contract entered into by the Board for the dealer making the advance, with the American Distilling Company and one of its subsidiary corporations, for deposit of the money on the purchase by the Board of a quantity of Old Rocking Chair whiskey, to be purchased by the Board and delivered to the dealer making the advance.

The Board had no right to deliver to the contributing retail

dealers or to any other purchaser of liquor in this state any such receipt as that above described.

The law specifically says what shall be issued and delivered to all purchasers of liquor in this state and by whom same shall be issued. Section 16, Chapter 84, Laws of 1937, provides: ''The state liquor store shall upon each and every sale of liquor to any licensee, issue a duplicate invoice of the liquor purchased * * * a copy of which shall be delivered to the licensee and one copy retained at such store. The invoice shall show the date of purchase, name of employee making the sale, the quantity of each kind of liquor purchased, the price paid therefor, the name of the licensee and the number of the license, with such other information as may be required by the board. The licensee shall keep and retain his duplicate invoice of all purchases made by him from the state liquor store, which shall at all times be subject to inspection by the duly authorized officers, agents and employees of the board.'' The so-called receipt which the administrator issued to the retail dealers complies with none of the various provisions of section 16 of Chapter 84, supra.

There is no statutory authority for the Board to act as an agent for another. There is likewise no authority for the Board to deal directly with a prospective purchaser of liquor. Section 20, Chapter 84, Laws of 1937, provides: ''No member or employee of the board * * * shall be directly or indirectly engaged in dealing in liquor whether as owner, part owner, member of a syndicate, share holder or otherwise, whether for his own benefit or in a fiduciary capacity for others.''

In paragraph lettered (e) of the Board's communication of May 25, 1943, it is specified that the acquisitions and purchases of liquor to be made by the Montana Licensed Liquor Dealers Association and by them caused to be imported into the state of Montana shall not be from any seller or distiller whose products are now purchased by the Board, although such products, which shall not have been acquired directly or indirectly from any such seller or distiller, are exempt from the provision. Thus, if on May 25, 1943, the Board was buying from the American Distilling

Company, then the Association could not buy directly from such company but, if the Association could locate some broker or other purchaser who dealt with the company, then it would be permissible to deal with such broker or other purchaser and thus obtain liquor which originated with the company. Thus with the alleged scarcity of liquor, black markets, rationing and other conditions complained of by the Board, it would be possible for financial combinations or interests to corner the available liquor supply, deal directly with the Association, and in due time dry up the stocks of the Board, put out of business the licensed dealers other than those contributing in advance to the deal, render it impossible for the ordinary individual consumer to obtain liquor at the state stores and create an absolute monopoly to those who have the means to participate in the advances.

"The power to enact statute law was not, and could not, be delegated to the board. The provisions in the regulations adopted by the board by which the discretionary power here in question is assumed and created for itself by the board, are all void and of no effect." (*McFatridge* v. *District Court,* supra.)

There being no authority in the statutes for the doing of the acts complained of the Board had no power to do them. The Board has acted in excess of its power. The transactions and scheme are contrary to public policy, illegal and void. They should so be declared.

MR. JUSTICE ERICKSON:

I concur in the above dissenting opinion of MR. JUSTICE ADAIR