STATE ex Rel. GRIFFIN, Relator, v. GREENE et al., Re-
SPONDENTS.

(No. 7,689.)
(Submitted April 19, 1937. Decided May 1, 1937.)
[67 Pac. (2d) 995.]

*Mr. Merle C. Groene,* for Relator, submitted an original and a reply brief, and argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Carl N. Thompson,* Assistant Attorney General, and *Mr. John A. Matthews,* Attorney for the State Board of Equalization, submitted a brief for Respondents; *Mr. Matthews* argued the cause orally.

*Mr. Harry Meyer, Amicus Curiae,* submitted a brief and argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This is an original proceeding to enjoin the enforcement of Chapter 91, Laws of 1937.

By motion to quash the order to show cause issued by this court the sufficiency of the complaint is challenged by respondents. The attack upon the complaint does not question the sufficiency of the facts to raise the legal questions involved, but challenges the legal conclusions to be drawn from those facts.

The complaint questions the constitutionality of Chapter 91 in several particulars. It is first contended that it is in contravention of section 19, Article V of the Constitution, which reads: "No law shall be passed except by bill, and no bill shall be so altered or amended on its passage through either house as to change its original purpose."

It appears from the complaint that Chapter 91, as finally enacted, is the result of amendments or changes made in a bill introduced in the House, and designated House Bill No. 276. As originally introduced, the title to the bill was as follows: "An Act requiring licenses for the operation, maintenance, opening or establishment of movie theatres: Relating to exemptions from such license requirement: Relating to the collection and disposition of license fees and amending section 2434 of the Revised Codes of Montana of 1935, and repealing all Acts and

parts of Acts in conflict herewith. In its final form the title is as follows: "An Act requiring licenses for the operation, maintenance, opening or establishment of moving picture theatres: Relating to Exemptions from such License requirement: relating to the collection and disposition of license fees, and repealing all Acts and parts of Acts in conflict herewith."

As originally introduced, the body of the bill was identical with the bill as finally enacted, except, first, that, as originally introduced, the amount of the fee varied according to the population of the city in which the theater was operated and according to the number of theaters under the same general management, supervision, or ownership; second, as originally introduced, the bill provided that the fees "shall be paid annually"; as finally passed, the same provision that the fees "shall be paid annually" was still in the Act, but immediately followed by a provision that they shall be paid quarterly. The body of the bill, as originally introduced, as well as that of the Act as finally passed, deal with movie theaters. It is plain that the original purpose of the bill as introduced was to impose a license tax on moving picture theaters. That purpose was preserved and carried out in the bill as finally enacted. The amount of the tax and the time when payable is all that was changed in the bill as originally introduced. There was no departure from the prohibition contained in section 19, Article V of the Constitution.

The next contention is that Chapter 91 conflicts with the uniformity provisions of sections 1 and 11, Article XII of the Constitution. The Act imposes a license tax on operators of all moving picture theaters of $1\frac{1}{4}$ per cent. of the gross proceeds from the sale of tickets of admission in excess of $3,000 per quarter. The Act operates uniformly upon all operators of moving picture theaters. All operators have exempted to them the first $3,000 of gross income per quarter.

A license tax imposed for the privilege of doing business in Montana is not subject to the uniformity provisions of the state Constitution. (*State ex rel. Sam Toi* v. *French*, 17 Mont. 54, 41 Pac. 1078, 30 L. R. A. 415; *State* v. *Hammond Packing Co.*,

45 Mont. 343, 123 Pac. 407; *Quong Wing* v. *Kirkendall*, 39 Mont. 64, 101 Pac. 250, affirmed 223 U. S. 59, 32 Sup. Ct. 192, 56 L. Ed. 350; *State* v. *Hennessy Co.*, 71 Mont. 301, 230 Pac. 64; *Norum* v. *Ohio Oil Co.*, 83 Mont. 353, 272 Pac. 534.)

It is competent for the legislature to impose a license tax on certain occupations and not on others. (*Hale* v. *County Treasurer of Mineral County*, 82 Mont. 98, 265 Pac. 6.) Arbitrary and unreasonable classifications, however, are not permissible. (Id.) A classification cannot be said to be arbitrary and unreasonable unless it precludes the assumption that it was made in the exercise of legislative judgment and discretion. (*Stebbins* v. *Riley*, 268 U. S. 137, 45 Sup. Ct. 424, 69 L. Ed. 884, 44 A. L. R. 1454; *Bank of Miles City* v. *Custer County*, 93 Mont. 291, 19 Pac. (2d) 885, and cases there cited.)

The Act in question here operates alike upon all operators of moving picture theaters. It is not subject to the unlawful discrimination pointed out in *State* v. *Sunburst Refining Co.*, 73 Mont. 68, 235 Pac. 428. All are allowed a gross income of $3,000 per quarter exempt from the tax. Such a tax has been upheld. (*State* v. *Hennessy Co.*, supra.) Those who must pay a tax are all subject to the same rate.

It is contended that the classification is arbitrary because it excludes vaudeville and other forms of entertainment from the operation of the Act. This contention cannot be sustained. There is no showing made here that there are any exclusively vaudeville theaters in the state to which the Act could be made applicable if the legislature so desired. If there be any such they are separately taxed under an existing statute (sec. 2434, Rev. Codes). Moreover, we cannot say that there is not such a substantial difference between them and a moving picture theater to justify different treatment by the legislature. A strictly vaudeville theater, where it exists, offers employment and a means of livelihood to many more people than the moving picture theater. This difference alone would justify different treatment, or at least warrant us in assuming that the legisla-

ture in making the classification did so in the exercise of judgment and discretion, and not arbitrarily.

The next contention is that the Act violates the equal protection and due process of law clause of the Fourteenth Amendment to the federal Constitution. Relator relies upon the case of *Stewart Dry Goods Co.* v. *Lewis*, 294 U. S. 550, 55 Sup. Ct. 525, 527, 79 L. Ed. 1054. Chapter 91 here involved has essential features not present in the Kentucky statute (Acts Ky. 1930, Chap. 149) under consideration in the *Stewart Dry Goods Co. Case,* which distinguish it from the statute involved in that case. The Kentucky statute imposed a tax, as the court was careful to point out, "on gross sales, not on gross collections from vendees." Our statute imposes the tax on "gross proceeds from the sale of tickets of admission." Under the Kentucky statute the tax was measured by the gross sales whether the proceeds were actually received or not. Our statute simply measures the tax by the actual receipts from the sales. Also, the Kentucky statute was not confined to the sale of one particular commodity, but applied to the sale of commodities of every description. The court regarded that tax, not as a license tax for the privilege of doing business, but as a tax on the article itself. Our statute is a license tax expressly authorized as such by section 1, Article XII of the Montana Constitution. (Compare *State ex rel. Snidow* v. *State Board of Equalization,* 93 Mont. 19, 17 Pac. (2d) 68.) The Supreme Court of the United States has sustained license taxes similar to this. (*People ex rel. Cornell Steamboat Co.* v. *Sohmer,* 235 U. S. 549, 35 Sup. Ct. 162, 59 L. Ed. 355; *Equitable Life Assur. Soc.* v. *Commonwealth of Pennsylvania,* 238 U. S. 143, 35 Sup. Ct. 829, 59 L. Ed. 1239; *Northwestern Mutual Life Ins. Co.* v. *State of Wisconsin,* 247 U. S. 132, 38 Sup. Ct. 444, 62 L. Ed. 1025.)

The gross proceeds are simply the measuring stick by which the amount of the license tax is determined, and the courts will not interfere with the legislative determination of the method of arriving at the amount of the tax, it not being unreasonably discriminatory. (*Home Ins. Co.* v. *New York,* 134 U. S. 594, 10

Sup. Ct. 593, 33 L. Ed. 1025.) The Kentucky statute in the *Stewart Dry Goods Co. Case*, was one imposing a tax graduated in amount. Our statute was not patterned after that statute. It does not provide for a graduated tax. It is uniform on all operators of moving picture theaters. It simply creates an exemption of the first $3,000 quarterly proceeds, applicable to all operators, and imposes a uniform tax on the excess.

A theater tax, with classification more pronounced than that here, has been sustained by the United States Supreme Court in *Metropolis Theater Co.* v. *City of Chicago*, 228 U. S. 61, 33 Sup. Ct. 441, 57 L. Ed. 730. The *Metropolis Theater Company Case* was adhered to by all members of the court in the *Stewart Dry Goods Company Case.* Likewise, discrimination more apparent than that here was sustained in *Clark* v. *City of Titusville*, 184 U. S. 329, 22 Sup. Ct. 382, 46 L. Ed. 569. This case, too, was referred to with approbation in the *Stewart Dry Goods Company Case.*

True, under our statute, where several theaters are under the same management, supervision, or ownership, while a separate license shall be obtained for each theater, the tax and the exemption applies to the person, firm, corporation, association, or copartnership operating the theaters; in other words, each theater is not separately taxed; each operator or owner is separately taxed. In case of management or ownership of multiple theaters, there is but one exemption from the gross proceeds, and that is the exemption of $3,000. In this respect it is a chain tax; that is, it falls more heavily on those operating more than one theater; but classification in this respect has been sustained. (*State Board of Tax Commrs.* v. *Jackson*, 283 U. S. 527, 51 Sup. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464, 75 A. L. R. 1536; *Louis K. Liggett Co.* v. *Lee*, 288 U. S. 517, 53 Sup. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699; *Fox* v. *Standard Oil Co.*, 294 U. S. 87, 55 Sup. Ct. 333, 79 L. Ed. 780; *Gulf Refining Co.* v. *Fox*, 297 U. S. 381, 56 Sup. Ct. 510, 80 L. Ed. 731.) In *Fox* v. *Standard Oil Co.*, supra, the court held that the tax on chains

may be imposed so heavily as to discourage multiplication of the units.

Chapter 91, supra, does not conflict with the Fourteenth Amendment to the United States Constitution.

The Supreme Court of the United States in the above-cited cases had before it facts tending to show the advantages of chain operations, and particularly those resulting in economy of operation. Relator here, by challenging the statute on the ground that the classification is unreasonable and arbitrary, must assume the burden of so showing. He has made no showing as to the number of chain operators in the state or, in fact, whether there are any such. He makes it quite apparent from the complaint that he, himself, is not a chain operator. He alleges that he is the owner and operator of "a moving picture theatre at Chinook." If he, as the owner of a single theater, has advantages over a chain operator, he cannot complain of that. It is a well-established rule that only those adversely affected by an alleged discriminatory Act will be heard to question its validity. (*State ex rel. Intermountain Lloyds* v. *Porter*, 88 Mont. 347, 294 Pac. 363; *Pierson* v. *Hendricksen*, 98 Mont. 244, 38 Pac. (2d) 991; *Premier-Pabst Sales Co.* v. *Grosscup*, 298 U. S. 226, 56 Sup. Ct. 754, 80 L. Ed. 1155; *Utah Power & Light Co.* v. *Pfost*, 286 U. S. 165, 52 Sup. Ct. 548, 76 L. Ed. 1038; *Continental Baking Co.* v. *Woodring*, 286 U. S. 352, 52 Sup. Ct. 595, 76 L. Ed. 1155, 81 A. L. R. 1402.) Hence on this additional ground the statute here must be sustained as against the attack being considered.

The next contention is that the statute is so ambiguous that it should be declared void on that account. The Act imposes criminal penalties for its violation. This being so, unless it is sufficiently explicit so that all those subject to the penalties may know what to avoid, it violates the essentials of due process. (*H. Earl Clack Co.* v. *Public Service Com.*, 94 Mont. 488, 22 Pac. (2d) 1056.) This is likewise true of a statute imposing civil burdens (*State ex rel. State Board of Education* v. *Nagle*, 100 Mont. 86, 45 Pac. (2d) 1041), such as tax imposi-

tions. (*Vennekolt* v. *Lutey*, 96 Mont. 72, 28 Pac. (2d) 452.) Is the Act in question subject to this well-established rule?

Section 1 makes it unlawful for any person, firm, corporation, association, or copartnership to operate, maintain, open, or establish any movie theater without first procuring a license from the State Board of Equalization.

Section 2 requires the applicant to apply for a license giving the information therein stated.

Section 3 states that as soon as practicable after the receipt of the application, the state board may "if the application is found satisfactory and if the license fees herein prescribed shall have been paid," issue a license, and imposes the duty upon the licensee to display it in a conspicuous place in the theater.

Section 4 provides that all licenses shall be issued quarterly on the first days of April, July, October, and January; and that on or before the 1st day of each quarter the applicant is required to apply for a renewal of the license.

Section 5 requires that the applicant "shall pay the license fees hereafter prescribed." It then contains these provisions: "The license fees herein prescribed shall be paid annually. The license fees herein prescribed are payable quarterly on the first day of April, July, October and January of each year and shall be as follows: One and one quarter (1¼) per centum of the gross proceeds from the sale of tickets of admission in excess of the sum of three thousand dollars ($3,000.00) per quarter."

Section 6 prescribes the penalty for violating the Act. Other sections need not be noticed here, except the last, which makes the Act effective July 1, 1937.

The above-quoted portion of section 5 is relied upon here. The ambiguity arises from the contradictory language commanding, first, that the tax is payable annually, followed immediately by the provision for quarterly payments. The ambiguity, it is contended by relator, arises principally from the difficulty in making computation of the amount of the tax. Fair construction of the Act, we think, makes it compulsory for the State Board of Equalization to issue licenses to all applicants making

proper application, on July 1, 1937, and without the payment of any fees, for, since the Act is not made retroactive, there is at that time no tax prescribed by the Act.

It is true that section 3 provides that the board "may" issue the license. We have often held that "may" means "must." (*Montana Ore Purchasing Co.* v. *Lindsay*, 25 Mont. 24, 63 Pac. 715; *State ex rel. Malott* v. *Board of County Commrs.*, 86 Mont. 595, 285 Pac. 932; *State ex rel. Case* v. *Bolles*, 74 Mont. 54, 238 Pac. 586.) As used in section 3, it means "must," if the conditions have been complied with. The only discretion in the board is, first, to ascertain whether the application is satisfactory, that is: Does it contain all the information requested? and, second: Has the "license fee herein prescribed" been paid? None having been prescribed as payable on July 1, 1937, the license must issue when the first condition above is complied with. Thereafter the licenses must be renewed quarterly upon application therefor and upon payment of the fees, if any are then due, based upon the gross proceeds of the preceding quarter, above the exemption of $3,000. The license is not a receipt for taxes paid, but is an authorization to engage or continue in the business of operating a theater, and must issue even though there is at the time no fee paid because none is due. Payment of a fee is a condition precedent to the issuance of a license only when a fee is due and payable.

The statement that "the fees herein prescribed shall be paid annually" was in the bill as originally introduced and, under the scheme of taxation therein provided for, had a proper place in the bill. By amendments, the Act, as finally passed, made the tax payable quarterly and allowed quarterly exemptions of $3,000. Since the provisions requiring payments quarterly are specific in character and the provision providing for annual payment is general, the specific provisions control. (Sec. 10520, Rev. Codes; *British-American Oil Co.* v. *State Board of Equalization*, 101 Mont. 293, 54 Pac. (2d) 129.) When thus construed, the Act gives effect to the apparent legislative intent, and this we are enjoined to carry out wherever

possible. (Sec. 10520, supra; *State ex rel. Carter* v. *Kall*, 53 Mont. 162, 162 Pac. 385, 5 A. L. R. 1309; *State ex rel. Murray* v. *Walker*, 64 Mont. 215, 210 Pac. 90; *State ex rel. Golden Valley County* v. *District Court*, 75 Mont. 122, 242 Pac. 421.)

This court, in order to carry out the obvious intent of the legislature, may correct manifest error in a statute so long as no specific provision is abrogated. (*Hilburn* v. *St. Paul, M. & M. Ry. Co.*, 23 Mont. 229, 58 Pac. 551, 811.) The general provision for payment of the tax annually was, we believe, left in the statute as originally introduced through inadvertence and should be disregarded as surplusage. (*State ex rel. Lyman* v. *Stewart*, 58 Mont. 1, 190 Pac. 129; *Rose* v. *Sullivan*, 56 Mont. 480, 185 Pac. 562.)

The Act is not open to any of the objections urged against it. The motion to quash the order to show cause is granted and the proceeding dismissed.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concur.

Rehearing denied May 18, 1937.