STATE OF MONTANA ex rel. SCHULTZ-LINDSAY CON-
STRUCTION COMPANY, Inc., Plaintiff and Relator, *v.*
The STATE BOARD OF EQUALIZATION of the State
of Montana, JOHN C. ALLEY, Chairman, MORLEY
COOPER and HOWARD LORD, as members thereof, the
STATE HIGHWAY COMMISSION of the State of Mon-
tana, ALEX BLEWETT, Chairman, JOSEPH N. NASS,
S. N. HALVORSON, A. M. SWANSON and D. W. VAN
DELINDER, as members thereof, Defendants and Re-
spondents.

No. 10943.
Submitted April 22, 1965. Decided April 26, 1965.
403 P.2d 635.

Arnold A. Berger (argued), Billings, for appellant.

Edward Dussault (argued), Missoula, Jean Turnage (argued), Polson, A. W Scribner (argued), Helena, amici curiae.

Forrest H. Anderson, Atty. Gen., Helena, Donald A. Garrity, Asst. Atty. Gen., (argued), Helena, William A. Douglas (ar-

gued), Helena, Donald D. MacPherson (argued), Helena, for respondents.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This is an original proceeding. On March 31, 1965, relator filed a petition requesting this court to accept original jurisdiction of a declaratory judgment action to test the validity of House Bill 506, enacted into law by the Thirty-ninth Legislative Assembly of the State of Montana, as Chapter 277 of the Laws of 1965. Hereafter, for brevity, this will be referred to as the Act.

Relator alleged in its petition that the United States of America, through its Bureau of Public Roads, participates financially in the construction of interstate, primary and secondary roads throughout this state and other states; that because of the passage and threatened enforcement of the Act the Bureau of Public Roads ordered withdrawal of Federal participating funds that other states would continue to receive such Federal participating funds and would be able to continue their highway programs but that the withdrawal of funds from Montana would cause the state to fall behind in its road construction program and the entire economy of the state would be adversely affected; that a determination of the validity of the Act was of such urgency that this court should take original jurisdiction of the controversy.

Following an ex parte hearing upon such petition, and by reason of the allegations therein contained, this court accepted jurisdiction and ordered the filing of relator's complaint, and directed the respondents to appear to answer or otherwise plead to such complaint on or before April 12, 1965. Thereafter, by order the cause was set to be heard on oral argument on April 12, 1965, and was so heard and time granted for filing additional briefs. Such briefs have been filed and the cause has been submitted.

Relator in its complaint named as defendants and respondents the State Board of Equalization and its members, and the State Highway Commission and its members, and hereafter they will be referred to as respondents.

Relator alleged, inter alia, that it was a proceeding for declaratory relief under the Uniform Declaratory Judgments Act; that relator was a North Dakota corporation constructing public highways and engaged in that business in the State of Montana; that it intended in the future to continue to engage in such business; that such business was highly competitive and contracts for the construction of highways are awarded on the basis of competitive bidding, and to compete it was essential that no unfair and artificial advantages be given to its competitors. Further that the Act discriminates against relator by requiring it to pay a different and greater tax than Montana residents engaged in the business of constructing public highways are required to pay, that the State Board of Equalization is charged with the duty of enforcing, and would enforce, the Act; that in 1964 relator had received payments for work done for the State Highway Commission and paid all Montana license taxes required; that under the Act it would be required to pay a sum greatly in excess of the amounts paid in that year and that if it received the same amount of payments for work in 1965 the license and payments required under the Act would be greatly in excess of payments required by a resident Montana corporation; that plaintiff has several contracts with the State Highway Commission and the Commission will deduct one percent of all payments due relator and deliver such money to the State Board of Equalization, to the severe and irreparable damage of the relator; and that the Act is invalid in that it violates the Constitutions of the State of Montana and the United States of America in that it denies relator the equal protection of the laws, imposes a tax which is not uniform upon the same class of subjects, and is special legislation. Relator prayed for a declaratory judgment deter-

mining the validity of the Act and the duties and obligations of relator under the Act. Annexed to the complaint as an exhibit is a copy of the Act, which reads as follows:

"AN ACT PROVIDING FOR A NONRESIDENT CONTRACTOR'S LICENSE FEE

"BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF THE STATE OF MONTANA:

"Section 1, As used in this act: (1) 'Contractor' means an individual, partnership or corporation performing architectural, engineering or construction work in Montana for a federal, state or local agency of government.

"(2) 'Nonresident contractor' means (a) a corporate contractor, fifty-five per cent (55%) or more of the effective ownership of which is in persons who are not residents of Montana, or (b) an individual contractor who is not a resident of Montana or who is a nonresident stockholder in a nonresident corporate contractor, or (c) a partnership contractor, fifty-five per cent (55%) or more of the effective ownership of which is in persons who are not residents of Montana or who own stock in a nonresident corporate contractor.

"(3) 'Gross receipts' shall mean all receipts from sources within the state, whether in the form of money, credits or other valuable consideration, received from engaging in or conducting a business, without deduction on account of the cost of the property sold, the cost of the materials used, labor or service cost, interest paid, taxes, losses or any other expense whatsoever. However, 'gross receipts' shall not include cash discounts allowed and taken on sales, and sales refunds, either in cash or by credit, uncollectible accounts written off from time to time, and payments received in final liquidation of accounts included in the gross receipts of any previous return made by the person.

"Section 2. (1) For the privilege of qualifying as a nonresident contractor, a person shall first apply, upon forms prescribed by the board of equalization, and obtain a license so to

do, and pay a license fee, as provided in section 3 of this act. A license issued to a nonresident contractor shall cover all its operations in Montana regardless of the number of its establishments.

"(2) Application for a renewal of a license and payment of the initial fee of twenty-five dollars ($25.00) thereon shall be made not later than January 31st of each year. However, a nonresident contractor who has purchased a contractor's license prior to the effective date of this act will have his money refunded and purchase a nonresident contractor's license.

"(3) No license shall be issued for a period of time extending beyond the termination of the calendar year for which issued.

"(4) Any nonresident contractor subject to licensing provisions of a regulatory nature such as, for example, the requirement of posting a bond before commencing business as a collection agency, must, in addition to filing the regular application above mentioned, comply with such regulatory provisions before being entitled to a license hereunder.

"Section 3. The license fee for each nonresident contractor shall be twenty-five dollars ($25.00) plus a sum equal to one per cent (1%) of the gross receipts from such business during the income year for which the license is to be issued.

"Section 4. A nonresident contractor is exempt from the contractor's license tax, the income tax provided for in Title 84, Chapter 49, R.C.M.1947, and the corporation license tax provided for in Title 84, Chapter 15, R.C.M.1947, when such nonresident contractor is covered by the provisions of this Act. All other contractors must pay the contractor's license tax; and income tax provided for in Title 84, Chapter 49, R.C.M.1947; and the corporation license tax provided for in Title 84, Chapter 15, R.C.M.1947, were applicable.

"Section 5. A state, county and city agency for whom a nonresident contractor is performing work shall withhold, in addition to any other amounts withheld, one per cent (1%) of

all payments due the contractor and send such amounts to the state board of equalization. Should the state, county and city agency, for whom the nonresident contractor is performing work or has performed work, fails to withhold such amounts, the contractor shall make payment of these amounts to the state board of equalization. These payments must be submitted to the state board of equalization by the contractor within thirty (30) days of the date on which the contractor received each increment of payment for work performed by the contractor. When the state board of equalization has collected the tax provided for in Section 3 of this act, it shall refund any surplus.

"Section 6. In case of any failure to make and file a nonresident contractor's license return, the person failing to file such a return, upon conviction shall be fined not less than one thousand dollars ($1,000.00) or more than ten thousand dollars ($10,000.00).

"Section 7. Ninety-five per cent (95%) of all license fees collected under Section 3 of this act shall be deposited in the earmarked revenue fund to be used for state equalization aid to schools; five per cent (5%) shall be deposited in the earmarked revenue fund to be used by the state board of equalization in administering this act.

"Section 8. A corporation incorporated under Montana law is exempt from the license fee provided for in Section 3 of this act either:

"(a) (i) If it has filed corporation license tax returns for at least fifteen (15) years, and

"(ii) If at least thirty-five percent (35%) of the stockholders are Montana residents; or

"(b) If fifty-five percent (55%) or more of the stockholders are Montana residents.

"Section 9. All contractors who have not been in business prior to this act shall, on request, provide the state board of equalization with any information relating to ownership. Con-

tractors desiring exemption from the license fee in Section 3 of this act shall file proof of residency with the state board of equalization. In enforcing this act the state board of equalization shall determine effective ownership, regardless of corporate structure. A nonresident corporation may file a statement of intent to become a resident corporation with the board of equalization. The corporation's status may not be changed to resident until after five (5) years of such filing. If a corporation has been formed to circumvent the provisions of this act, it may not qualify for bidding on public projects.

"Section 10. Any bonding company furnishing bonds for a nonresident contractor shall file with the state board of equalization the names of the party or parties cosigning the bonds. A bonding company failing to file under this section shall, on conviction, be fined not less than five hundred dollars ($500) nor more than one thousand dollars ($1,000).

"Section 11. The state board of equalization is hereby authorized to formulate rules and regulations necessary for the effective implementation of this act's provisions.

"Section 12. This act is effective on its passage and approval."

Respondents appear by answer raising two defenses. The first being that the complaint fails to state a claim against respondents upon which relief can be granted. In their second defense, respondents admit practically all of the fact allegations of the complaint, except they deny the allegations with respect to the highly competitive nature of the business of constructing public highways, and that it was essential that no unfair and artificial advantages be given to relator's competitors in that business, as well as all allegations with respect to increased payments required under the Act, of discrimination, invalidity or unconstitutionality thereof. Respondents pray that the complaint be dismissed or that the Act be adjudged valid and enforceable against relator.

The challenges levelled at the Act by the relator are:

(1) That it denies the equal protection of the law;

(2) Imposes a tax which is not uniform upon the same class of subjects; and

(3) That it is special legislation.

As to these challenges relator asserts the Act is in violation of Art. IV, § 2, of the United States Constitution, which provides:

"The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." Further, that it violates the due process clause contained in the Fourteenth Amendment to the United States Constitution, which in part, provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."; that it violates Art III, § 27 of the Montana Constitution, which provides: "No person shall be deprived of life, liberty, or property without due process of law." and Section 11 of the same Article, which provides: "No ex post facto law nor law impairing the obligation of contracts, or making any irrevocable grant of special privileges, franchises, or immunities, shall be passed by the legislative assembly."; that it violates Art. V, § 26 of the Montana Constitution which prohibits the Legislative Assembly from passing local or special laws in the instances therein enumerated, and concludes: "In all other cases where a general law can be made applicable, no special law shall be enacted."; that it violates Art. XII, § 1, of the Montana Constitution, which reads:

"The necessary revenue for the support and maintenance of the state shall be provided by the legislative assembly, which shall levy a uniform rate of assessment and taxation, and shall prescribe such regulations as shall secure a just valuation for taxation of all property, except that specially provided for in

this article. The legislative assembly may also impose a license tax, both upon persons and upon corporations doing business in the state."

Finally, that the Act is unjust, inequitable, arbitrary, discriminatory and class legislation and unreasonably restricts the right of contract.

We do not deem it necessary to discuss each challenge to the constitutionality of the Act separately, but will turn to those which appear to us to be determinative in this proceeding.

It is conceded that the Act is presumed to be valid and its constitutionality will not be condemned unless its invalidity is shown beyond a reasonable doubt, and the burden of proving its invalidity rests upon the one attacking the statute. If it is found, however, that the statute violates the Constitution the courts will pronounce it void. State v. Gateway Mortuaries, Inc., 87 Mont. 225, 287 P. 156, 68 A.L.R. 1512.

That the Legislature may impose a license tax on certain occupations and not on others is well settled. Hale v. County Treasurer, 82 Mont. 98, 265 P. 6.

However, arbitrary and unreasonable classifications are not permissible. State ex rel. Griffin v. Greene, 104 Mont. 460, 67 P.2d 995, 111 A.L.R. 770.

It is apparent that the Act is designed as a revenue measure since it allocates ninety-five percent of the fees to be collected to be used for state equalization aid to schools. Section 7 of Act. It is not, therefore, a licensing act enacted under the police power of the state.

It is contended that the Act violates the due process and equal protection clauses of the Constitution in two respects. First, it applies only to nonresident contractors, and secondly, it applies only when the contracting agency is a public body. It would appear from the wording of the Act that the residency of the contractor is the sole criterion distinguishing one group of contractors, even if we concede that such a status can be determined. There have been previous cases before this

court wherein discrimination between residents and nonresidents was charged.

In State v. Sunburst Refining Co., 73 Mont. 68, 235 P. 428, a license tax of two cents per gallon of gasoline was imposed for the privilege of doing business in Montana in the sale of such products, except those shipped into this state and sold in original containers. It was contended this license tax discriminated against Montana dealers. In its opinion this court stated:

"No one could have the temerity to say that in its practical operation the statute does not discriminate against the manufacturer of or dealer in Montana-manufactured gasoline or distillate. But it is not sufficient, to condemn the statute, that it merely discriminates against some distributors or dealers. Exact equal protection of the law is seldom, if ever, obtained; and because of the very frailty of human agencies, the authorities all recognize the right of the legislative branch of government to make reasonable classifications of subjects for property or occupation taxes (Hilger v. Moore, 56 Mont. 146, 182 P. 477), *and if the classification is reasonable, and if all of the subjects within a given class are accorded the same treatment,* the legislation cannot be said to deny to anyone within such class the equal protection of the law, even though the burden imposed upon him may be more onerous than that imposed upon a member of another class. Quong Wing v. Kirkendall, 39 Mont. 64, 101 P. 250; s. c., 223 U.S. 59, 32 S.Ct. 192, 56 L.Ed. 350 (see, also, Rose's U.S. Notes). *But to justify such discriminatory legislation, and avoid the condemnation of the Fourteenth Amendment to the federal Constitution, the classification must be reasonable—that is, must be based upon substantial distinctions which really make one class different from another.* State ex rel. Northern Pac. Ry. Co. v. Duncan, 68 Mont. 420, 219 P. 638." (Emphasis ours.)

Later in the same opinion the court stated:

"Under our 1923 statute the place of origin is made the sole basis for the classification attempted, and if the Legislature

may make the place of origin of gasoline or distillate the sole basis for classification, it may impose a license tax upon those who deal in gasoline or distillate manufactured by the Sunburst Refining Company, and exempt those who deal in gasoline or distillate manufactured by the Miles City Refinery Company. But no one would attempt to justify a classification made solely upon the basis that the first-mentioned products were manufactured at Great Falls, while the others were produced at Miles City. The statute cannot be defended upon any theory. In its practical operations it is such an arbitrary, unjust, and unreasonable discrimination against those dealing in Montana-manufactured gasoline and distillate as to deny to them the equal protection of the law."

While most of the cases which have been before this court attacking the constitutionality of license taxes have been with respect to license taxes enacted under the police power of the state, while admittedly this license tax is one enacted principally for revenue purposes, yet holdings of this court with respect to discrimination would be similar whether the license tax was one for regulations under the police power or for revenue under the taxing power.

State v. Safeway Stores, Inc., 106 Mont. 182, 76 P.2d 81, involved a challenge to the constitutionality of the eight-hour day work law, wherein it was contended that it violated the Fourteenth Amendment to the United States Constitution and section 27 of Art. III of the Montana Constitution. The court sustained the constitutionality of the law, and in its opinion stated:

"Defendant also contends that it has been deprived of the equal protection of the laws. It is argued that the statute constitutes arbitrary discrimination rather than reasonable classification. It must be remembered that in the matter of classification, the Legislature enjoys broad discretion and is not required to go as far as it might in enacting a law. The question of classification is primarily for the Legislature. The pre-

sumption is that it acted on legitimate grounds of distinction, if any such grounds existed. 6 R.C.L., § 376, p. 364; State v. Loomis, supra [75 Mont. 88, 242 P. 344]; Hilger v. Moore, 56 Mont. 146, 182 P. 477.

"The constitutional safeguard against unjust discrimination in legislation of this type is well defined by the decisions everywhere, and that is, *that the classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.* Mills v. State Board of Equalization, 97 Mont. 13, 31, 33 P.2d 563." (Emphasis ours.)

In State v. North Am. Car. Corp., 118 Mont. 183, 192, 164 P.2d 161, 165, a case dealing solely with taxation, the statement of this court with reference to classification is apropos here, as follows:

"Sections 1 and 11 of Article XII of the Constitution of Montana respectively provide:

" '1. The necessary revenue for the support and maintenance of the state shall be provided by the legislative assembly, which shall levy a uniform rate of assessment and taxation, and shall prescribe such regulations as shall secure a just valuation for taxation of all property, except that specially provided for in this article.'

" '11. Taxes shall be levied and collected by general laws and for public purposes only. They shall be uniform upon the same class of subject within the territorial limits of the authority levying the tax.'

"This court in interpreting these two provisions of the Constitution said, in the case of Hilger v. Moore, 56 Mont. 146, 170, 182 P. 477, 481: 'Construing the first sentence of section 1 with section 11 the meaning is reasonably clear: The taxes levied shall be uniform upon the same class of property within the same taxing district. The entire state is one district for the purpose of raising state taxes. Every county is a separate

district for county taxes, every city for city taxes, etc. Or, stating the principle of sections 1 and 11 in different form, the mandatory injunction to the Legislature is that it shall prescribe such uniform mode of assessment as shall secure a just valuation of all taxable property, that all taxes shall be levied and collected by general laws and for public purposes only, and that *they shall be uniform upon the same class of property within the territorial limits of the authority levying the tax. This is the rule of uniformity declared by our Constitution, if we are able to determine the intention of its framers aright.'*

"*We think it will be admitted that any tax against the same kind of property used for identical purposes is not uniform when a different valuation and a different rate is applied to two distinct taxpayers, separately distinguishable only in name,* and the tax being imposed by the same taxing district. We further believe it will be admitted that such disregard of the uniform clause of sections 1 and 11 of Article XII, supra, constitutes clear discrimination.

"In the case of State ex rel. Northern Pacific Ry. Co. v. Duncan, 68 Mont. 420, 219 P. 638, 639, the railway company complained of discrimination by the county taxing officials where improvements on railroad land had been classified for taxation purposes in a class taking a higher rate under section 2000 [R.C.M.1921, now R.C.M.1947, § 84-302], than like improvements of other taxpayers similarly situated. The court granted the writ asked for and in the course of its opinion said:

" 'It is asserted that the improvements mentioned in class 4 of section 1999 [Revised Codes 1921, now R.C.M.1947, § 84-301] apply only to those upon land, town, and city lots, and, as the improvements in question are not upon town or city lots, and not upon land because within a roadway, therefore the improvements in question do not come within class 4, and so inevitably must come within class 7. * * *

" 'If respondent's contention were correct we should have different valuations for the same kind of property. If a mer-

chant owned a warehouse upon a tract of land adjoining the railroad right of way, the warehouse would be in class 4, and taxed upon the 30 per cent basis. An adjoining and precisely similar warehouse owned by the railroad upon its right of way would be within class 7, and be taxed upon the 40 per cent basis. * * * By such construction we should have two classes of improvements precisely similar, without anything to distinguish one class from another, except that the property in one class belonged to a railroad and the other to an individual.

" ' "*Classification must be based upon substantial distinction which makes one class really different from another.* Northwestern Mut. Life Ins. Co. v. [State of] Wisconsin, 247 U.S. 132, 38 S.Ct. 444, 62 L.Ed. 1025." Northern Pac. Ry. Co. v. Sanders County, 66 Mont. 608, 214 P. 596.' " (Emphasis ours.)

In 1948, the court had before it the case of Brackman v. Kruse, 122 Mont. 91, 199 P.2d 971, which was an action for a declaratory judgment with respect to a licensing statute providing for a fee of $250 per quarter on wholesale dealers in oleomargarine and $100 per quarter upon retail dealers, wherein the statute was challenged as being unconstitutional because the license fees were prohibitive and confiscatory and in effect prohibited the carrying on of a legitimate business in violation of the Fourteenth Amendment to the Constitution of the United States and of sections 3 and 27 of Article III and Sections 1 and 11 of Article XII of the Montana Constitution.

Then Chief Justice Adair wrote the majority opinion of the court and discussed the difference between license fees enacted under the police power and those enacted under the taxing power as revenue measures, quoting from 53 C.J.S. Licenses § 3, these words:

" '*When Tax.* Where the fee is exacted solely or primarily for revenue purposes and payment of the fee gives the right to carry on the business or occupation without the performance of any further conditions, it is not a license fee but a tax imposed under the power of taxation, * * *' "

The opinion continued:

"Obviously the legislature was and is without power to prohibit a legitimate business or to create a monopoly in favor of one branch of industry handling food products and against another branch of industry handling equally wholesome articles of food. (Citing cases.)"

Following a review of many authorities, the opinion stated:

"In New State Ice Co. v. Liebmann, 285 U.S. 262, 52 S.Ct. 371, 374, 76 L.Ed. 747, the court said: 'Plainly, a regulation which has the effect of denying or unreasonably curtailing the common right to engage in a lawful private business, such as that under review, cannot be upheld consistent with the Fourteenth Amendment. Under that amendment, nothing is more clearly settled than that it is beyond the power of a state, "under the guise of protecting the public, arbitrarily (to) interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them." * * *

" 'The control here asserted does not protect against monopoly, but tends to foster it. The aim is not to encourage competition, but to prevent it; not to regulate the business, but to preclude persons from engaging in it.'

"In Martin v. Nocero Ice Cream Co., 269 Ky. 151, 106 S.W. 2d 64, 66, the court said: 'The evidence introduced by appellees shows conclusively that individuals and corporations engaged in the business of manufacturing and selling ice cream, heretofore, prosperous, have been operating at a loss since the tax on ice cream became effective on July 1, 1936, and that the business cannot be conducted at a profit so long as the tax is in effect.' * * * A powerful organization of men engaged in different pursuits might prevent the imposition of a prohibitive license tax upon their respective callings or occupations, but what is to become of the man without political power, whose means of livelihood are taken away by the imposition of a prohibitive tax? Shall we still say that the

amount of the tax is within the discretion of the taxing power, or shall we say that among the inalienable and inherent rights guaranteed by our Constitution to every law-abiding citizen is the right to live and enjoy life and the right to acquire property, and that these rights necessarily carry with them the right to gain a livelihood and acquire property by following any useful or legitimate occupation, the pursuit of which is not injurious to the public weal. In our opinion there is but one answer to this question: If you deprive a man of the means of livelihood, you necessarily deprive him of the right to live and enjoy his life. Great as is the taxing power, it can never rise superior to the inalienable rights guaranteed by our Constitution. As the evidence in this case shows that the license tax in question is prohibitive, we have no hesitancy in declaring it invalid.' * * *

"In Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 501, 38 L.Ed. 385, the court said: 'The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations; in other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts.'

"In 16 C.J.S. Constitutional Law, § 201, page 584, it is said: 'Unless the occupation or business is of a nature which is injurious or offensive to the public welfare, see 53 C.J.S. Licenses, § 19, also 37 C.J. p. 193, note 54, the imposition of a license tax contravenes the constitutional guarantees of person and property where the tax is so unreasonable or arbitrary as to amount to a confiscation of property or a denial of the right to engage in a particular trade, occupation, or profession, particularly when it is levied pursuant to the police power of the state.'

"In Bessette v. People, supra, 193 Ill. 334, 62 N.E. 215, 56 L.R.A. 558, the court said: 'In Allgeyer v. State of Lou-

isiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832, it was said: "The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase, 'pursuit of happiness,' in the Declaration of Independence, which commenced with the fundamental proposition that 'all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness.' This right is a large ingredient in the civil liberty of the citizen." It was also said in the latter case: "The liberty of pursuit, the right to follow any of the ordinary callings of life, is one of the privileges of a citizen of the United States." * * *

" ' "When the police power is exerted for the purpose of regulating a useful business or occupation, and the mode in which the business may be carried on, * * * the legislature is not the exclusive judge as to what is a reasonable and just restraint upon the constitutional right of the citizen to pursue his calling, and to exercise his own judgment as to the manner of conducting it. The general right of every person to pursue any calling, and to do so in his own way, provided that he does not encroach upon the rights of others, cannot be taken away from him by legislative enactment." Ruhstrat v. People, supra, 185 Ill. 133, 57 N.E. 41, 49 L.R.A. 181, 76 Am.St.Rep. 30, and authorities there referred to. It has also been held that " 'the right to choose one's occupation is the right to be free from unlawful interference or control in the conduct of it.' " Id.; Black Const. Law, p. 412.'

"In 37 C.J., § 37, page 187, it is said: 'But where a license or license tax is imposed under the police power as a means of regulation, it must not be imposed upon such terms and conditions as to operate as the virtual prohibition of a useful and legitimate occupation and business; and this rule has been held to apply, regardless of whether the license tax is levied under the police or the taxing powers.' See also 53 C.J.S. Licenses, § 17.

"In Flynn v. Horst, supra, 356 Pa. 20, 51 A.2d 54, 56 in holding unconstitutional a legislative act imposing a license fee of $500 a year on wholesalers and $100 per annum on retail dealers in oleomargarine, the court said: 'For all the fiscal years between 1931 and 1946, the amount collected from oleomargarine licenses ranges from two to five times the amount expended by the Bureau of Foods and Chemistry in the enforcement of all the laws, the enforcement of which is charged to that Bureau. * * *

" 'No principle is more firmly established in the law * * * than the principle that a revenue tax cannot be constitutionally imposed upon a business under the guise of a police regulation, and that if the amount of a "license fee" is grossly disproportionate to the sum required to pay the cost of the due regulation of the business the "license fee" act will be struck down. The courts interfere with the discretion of the legislature in such matters only "where the regulations adopted are arbitrary, oppressive, or unreasonable." Cooley's Constitutional Limitations, 8th ed., Vol. 2, p. 1228. The regulations in question when tested by this standard require judicial interference with the legislative act creating them.

" 'We agree with the court below that the facts clearly prove that so much of section 2 of the act challenged, which imposes license fees of $500 upon wholesale dealers in oleomargarine and $100 upon retail dealers in oleomargarine, is unconstitutional and void.' "

In considering the constitutionality of the license tax imposed upon trading stamps in Garden Spot Market, Inc. v. State Board of Equalization, 141 Mont. 382, 397-399, 378 P.2d 220, 228-229, the court stated:

"The Act purports to grant to merchants in the State the right to engage in the use of stamps and devices upon the payment of the license tax, without requiring the performance of any further conditions, and that the Act, therefore, is a revenue, not a regulatory measure.

"If, as defendants contend, the Act is a regulatory measure, it is most unusual in that regard, for, other than the requirement of a license fee, the only other semblance of regulation set forth therein is that the Board may require the applicant for a license to state in his application such facts as the Board may deem necessary to enable it to pass upon the application. But, whether enacted under the guise of a regulation or whether made for the purpose of raising revenue, if the effect of a statute is to indirectly prohibit a legitimate business, so far as the police power is concerned, such a statute must be considered in the same light as a statute containing a direct prohibition. Brackman v. Kruse, supra, 122 Mont. 91, 199 P.2d 971. * * *

"While we do not bottom this opinion on whether the Act is ambiguous or misleading, or unreasonably discriminatory, or whether the penalty is excessive, yet those factors, taken collectively demonstrate that the Act clearly and palpably prohibits a legitimate business enterprise, as so declared by the Legislature.

"Under sections 3 and 27 of Article III, quoted previously, legitimate business enterprise is protected against this very type of legislation. This court in Brackman v. Kruse, supra, 122 Mont. 91, 112, 199 P.2d 971, pointed out that under either theory the Legislature cannot, directly or indirectly, prohibit a legitimate business or occupation * * *."

Recently in State ex rel. Bennett v. Stow, 144 Mont. 599, 399 P.2d 221, we reaffirmed the principle that in Montana every person has a right to operate a business subject to the applicable laws of the state, and that he may not be deprived of such a property right without due process of law as guaranteed by Section 27, Article III of our Constitution, and is entitled to the equal protection of the laws of this state as guaranteed by the Fourteenth Amendment to the Constitution of the United States.

From the above authorities it appears that the state

can under its power to license, regulate a class, in this case contractors, but that such regulation must be reasonable and not arbitrarily discriminatory. The question then becomes, under the situation existing here, have the members of the class covered by the Act, nonresident contractors, been unreasonably and arbitrarily discriminated against?

Relator argues yes, decidedly so, in that nonresident contractors must pay a different license fee than resident contractors and they are both members of the same class, and that no basis exists for treating the members of the class differently for tax purposes.

Respondents contend that in the area of taxation, Montana has always treated nonresidents as a separate class, citing the differences existing as to service of process upon the Secretary of State on behalf of nonresident highway users, limiting right to vote and hold public office to its residents, and other situations of similar import, but none of these have to do with the field of taxation. It is true they cite increased fees for fishing and hunting licenses for nonresidents, that nonresidents only pay income taxes on the portion of their income earned in this state, and requirement that nonresident employers withhold income taxes upon salaries of resident employees, and contend that by reason of these situations not every statute which discriminates against nonresidents is invalid. We do not disagree with that conclusion, based on the instances cited, except that we fail to find them applicable to the situation in this case. There are distinguishing characteristics in each instance but we do not deem it necessary to further discuss them because the real argument of respondents is not based on those grounds.

What respondents actually contend is that the Legislature became aware of the need for separate tax treatment of nonresident public works contractors and devised a scheme of taxation which would recognize these differences and yet not result in any substantial discrimination to the nonresident contractor. This contention, of course, is exactly legally the oppo-

site of the avowed purpose of the Act, it containing no police power provisions. However, for purposes of discussion we shall consider it. It was brought out on argument that nonresident corporate public works contractors received in excess of one hundred fifty million dollars from public works contracts in the fiscal year 1963-1964, and paid only $86,673.34 to the state in corporation license taxes. That comparing these figures with those of resident corporate public works contractors the Legislature had been advised that the resident contractors paid a much larger percentage of their gross receipts to the state in corporation license taxes. That by reason of this situation the Legislature determined to equalize the tax burden as between resident and nonresident contractors. Even admitting there may be differences in taxation of the resident and nonresident, respondent contends that the difficulty of collecting taxes from nonresidents is sufficient to justify their separate classification in a system of taxation.

If we were to concede that the tax burden has been unequal between resident and nonresident contractors, so as to justify a different classification for each, could it be said that the imposition upon the resident contractor of a tax based upon its profit under the corporation license tax law would not be arbitrarily and unreasonably discriminatory as to a nonresident contractor upon whom a tax is computed on the basis of his gross receipts? It is a matter of common knowledge that there is a vast difference between profit and gross receipts. In the instance of profit all expenses have been paid, and it is net to the recipient; as to gross receipts nothing has been paid for expenses and there may be no profit.

We cannot observe any basis under any set of facts where such a classification can be sustained as not creating an arbitrary and unreasonable discrimination; in our view the license tax here attempted to be imposed by the Act is arbitrarily and unreasonably discriminatory and in direct violation of Section 27 of Article III, Section 26 of Article V, and Section

1 of Article XII of the Montana Constitution, as well as the Fourteenth Amendment to the United States Constitution.

Article VI of the United States Constitution provides in part: "This Constitution * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

▉ We, as members of the judicial branch of government, must uphold the provisions of the Constitution of the United States and the Constitution of Montana, and to do so we must and do hold that the Act is invalid and unconstitutional.

There exist many provisions in the Act which could be discussed which reflect uncertainties, conflicts and arbitrary provisions, but holding as we have and as before stated, we do not deem it necessary to further comment thereon.

All this is not to say, however, that we either condone or approve escape from legal taxation by nonresident contractors, nor do we condemn the attempt by the Legislative Assembly to remedy the inequities which rather clearly appear from the arguments presented to us in this cause. The attack upon the effort has been to the method, and it is the method that meets the constitutional objection and requires us to strike it down.

We have been favored with extensive and exhaustive briefs in this matter by counsel, as well as by amicus curiae which were permitted by the court to appear and brief this cause. We commend counsel for their briefing and oral arguments since time was short for their preparation and we extend our thanks for their fine efforts.

Mr. Justice Adair at every opportunity in this cause has contended this court has no jurisdiction in this matter because it was not originally filed in the district court. In his dissent to our order of April 26, 1965, he cites the case of Brackman v. Kruse, 122 Mont. 91, 199 P.2d 971, apparently as authority for his position. That case, like hundreds of others, was filed in the district court and appealed to this court. It is not authority for

his position because there was no application to this court to accept original jurisdiction nor any immediate emergency which would cause such a request to be made.

However, authority for accepting jurisdiction of a declaratory judgment action is to be found in the case of Carey, State Treasurer v. McFatridge, 115 Mont. 278, 142 P.2d 229, in which then Chief Justice Howard A. Johnson wrote the majority opinion for the court, and the opinion stated:

"This is a declaratory judgment action, of which this court has accepted original jurisdiction as necessary and proper to the complete exercise of its appellate jurisdiction, in view of the emergency presented and the consequent inadequacy of the ordinary appellate procedure."

Mr. Justice Adair was a member of the court at that time and filed a dissenting opinion in that case to the holding of the court, but nowhere in his dissent did he challenge the right of the court to accept original jurisdiction, and it was on the authority of that case, and other prior decisions, that original jurisdiction was accepted in this cause.

Mr. Justice Adair quotes from Section 2 of Article VIII of the Montana Constitution, but he disregards what is said in Section 3 of Article VIII that this court shall have power in its discretion to issue such other original and remedial writs as may be necessary or proper to the complete exercise of its appellate jurisdiction. Under this provision of the Constitution the court assumed original jurisdiction as to a writ of injunction in Sawyer Stores, Inc. v. Mitchell, 103 Mont. 148, 62 P.2d 342; of a proceeding in mandamus in State ex rel. Palagi v. Regan, 113 Mont. 343, 126 P.2d 818; of a declaratory judgment action in Gullickson v. Mitchell, 113 Mont. 359, 126 P.2d 1106; of an injunction in a matter pertaining to a general election in State ex rel. Greene v. Anderson, 113 Mont. 582, 129 P.2d 874.

The court did not act without precedents in accepting original jurisdiction in this matter. Finally, the Uniform Declaratory Judgments Act, § 93-8901, R.C.M.1947, under which

this action was brought provides: "Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." This court is a court of record.

Additionally, this court's own rule of long unchallenged standing provides in Rule IV, subd. 1, as follows:

"*When Accepted.* This is an appellate court but it is empowered by the Constitution of Montana to hear and determine such original and remedial writs as may be necessary or proper to the complete exercise of its appellate jurisdiction. The institution of such original proceedings in this Court is sometimes justified by circumstances of an emergency nature, as when a cause of action or a right has arisen under conditions making due consideration in the trial courts and a due appeal to this Court an inadequate remedy, or when supervision of a trial court other than by appeal is deemed necessary or proper."

 This is such a cause, where an emergency situation requires this court to accept original jurisdiction, and thus render a public service in the interest of justice.

MR. JUSTICES JOHN CONWAY HARRISON, DOYLE and CASTLES concur.

MR. JUSTICE ADAIR:

I dissent.

Section 2 of Article VIII of the Constitution of Montana, in part, declares that: "The supreme court, except as otherwise provided in this constitution, shall have appellate jurisdiction only."

The action now before this, the Supreme Court of Montana, is an action seeking a declaratory judgment and such action should have been commenced in a district court of this state and not in the Supreme Court. See Brackman v. Kruse, 122 Mont. 91, at pp. 93 and 94, 199 P.2d 971.

On the Supreme Court's order of March 31, 1965, I filed a written dissent wherein I stated that, "In my opinion the Su-

preme Court of Montana is without jurisdiction in this cause which has at no time been filed or brought in any district court of this state, and which is not brought to this court on appeal. For the above reasons I dissent to this court's attempting to exercise jurisdiction herein."

In Brackman v. Kruse, supra, the opening paragraph of the opinion reads:

"This is an action for a declaratory judgment commenced in the district court to have determined and declared the constitutionality of section 2620.45 and 2620.46, Revised Codes of Montana, 1935."

To properly confer the necessary jurisdiction upon this court in the instant cause the action should have been brought in the district court and after decision there the appeal could have been taken to the Supreme Court by any dissatisfied party to the action.